IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ALLEGIS GROUP, INC. and ASTON
CARTER, INC.,

    *Plaintiffs*,

    v.                                Civil Action No. ELH-22-686

CHRISTOPHER J. BERO,

    *Defendant*.

**MEMORANDUM OPINION**

This case involves claims of breach of non-solicitation and non-disclosure covenants asserted by plaintiffs Allegis Group, Inc. ("Allegis") and its affiliate, Aston Carter, Inc. ("Aston") (collectively, "plaintiffs" or "Aston"), against defendant Christopher J. Bero. ECF 1 (Complaint); ECF 50-1 (Amended Complaint). The suit arises from Bero's prior employment with Aston and Aerotek, Inc. ("Aerotek"),[1] a subsidiary of Allegis, and subsequent departure to Jobot, LLC ("Jobot"), a competitor in the professional staffing industry.[2]

Two contracts are at issue, both of which are appended to the suit. One is defendant's employment agreement with Aston (ECF 1-1, "Employment Agreement"). The other is the Allegis Group Investment Growth Plan for Key Employees ("IGP" or "Plan"). ECF 1-2.

The Complaint contains three counts. In Count I, Aston asserts that Bero breached paragraphs 6 and 7 of the Employment Agreement by violating the "Covenant Not To Divulge Confidential Information" ("Non-Disclosure Covenant") and by violating the provision

---

[1] According to plaintiffs, Aerotek is now known as Aerotek Affiliated Services, Inc.  ECF 65-1 at 7.

[2] Jurisdiction is founded on diversity of citizenship.  *See* 28 U.S.C. § 1332(a)(1).

concerning "Return And Preservation of Records." ECF 1 at 11-12. In Count II, plaintiffs assert a breach of the IGP, which contains a covenant not to compete and a confidentiality provision. *Id.* at 12-13. In Count III, plaintiffs seek a declaratory judgment that plaintiffs are not monetarily liable to Bero under the IGP. *Id.* at 13.  Plaintiffs also seek monetary damages under Counts I and II, costs, attorney's fees, as well as injunctive relief. *Id*. at 13-14.[3]

Plaintiffs have moved to file a First Amended Complaint (ECF 50), supported by a memorandum (ECF 51) (collectively, "Motion to Amend").   The proposed First Amended Complaint is docketed at ECF 50-1 ("Amended Complaint"). Plaintiffs seek to include facts obtained through discovery and to add an entirely new claim to Count I.  In particular, plaintiffs seek to add a claim for breach of the non-solicitation provision in paragraph 4 of the Employment Agreement ("Non-Solicitation Covenant"). Defendant filed an opposition (ECF 55), supported by seven exhibits. ECF 55-1 to ECF 55-7. Plaintiffs replied (ECF 59), supported by a single exhibit. ECF 59-1.[4]

---

[3] At the commencement of this litigation, plaintiffs moved for a temporary restraining order. ECF 6. However, the parties subsequently stipulated that Bero would withhold from misappropriating plaintiffs' confidential information, and that he would not destroy or tamper with any of plaintiffs' confidential information in digital form. ECF 21. I approved the stipulation and denied the motion as moot. ECF 23.

[4] Bero filed an answer to the original Complaint, ECF 27 ("Answer"), in which he asserted a four-count Counterclaim, with a single count lodged against Allegis and Aerotek, and the remaining three counts asserted only against Aerotek. *Id.* Bero's claims were rooted in Aerotek's failure to pay money allegedly owed to Bero under the IGP. *Id.* Bero subsequently filed an Amended Counterclaim. *See* ECF 39. Both Allegis (ECF 40) and Aerotek (ECF 41) moved to dismiss the Amended Counterclaim. Thereafter, Bero voluntarily dismissed the Amended Counterclaim. *See* ECF 60.

Curiously, plaintiffs did not append the Employment Agreement or the IGP to the Amended Complaint, even though the Amended Complaint superseded the original complaint. *See*, *e.g.*, *Goodman v. Diggs*, 986 F.3d 493, 498 (4th Cir. 2021); *Young v. City of Mt. Ranier*, 238 F.3d 567, 573 (4th Cir. 2001). Nevertheless, I will consider the two documents, because they are central to the suit, and no objection has been lodged.

In addition, plaintiffs have moved for summary judgment, pursuant to Fed. R. Civ. P. 56(a). ECF 65 (the "Motion"). The Motion is supported by six exhibits, as well as multiple attachments to the exhibits. ECF 65-2 to ECF 65-7. Bero filed a combined opposition to the Motion and cross-motion for summary judgment (ECF 70), supported by a memorandum (ECF 70-1) (collectively, "Cross Motion"), as well as eighteen exhibits.  ECF 70-2 to ECF 70-19. Plaintiffs filed a combined reply in support of the Motion and opposition to the Cross Motion. ECF 78.  Defendant replied. ECF 84.

Bero has also moved to strike the expert testimony and related exhibits of Gregory Allen Freemyer (ECF 73), supported by a memorandum (ECF 73-1) (collectively, "Motion to Strike"), as well as an exhibit. ECF 73-2. Plaintiffs filed an opposition (ECF 81), supported by three exhibits. ECF 81-1 to ECF 81-3. Defendant replied (ECF 85), supported by an exhibit. ECF 85-1.

No hearing is necessary to resolve the motions.  *See* Local Rule 105.6. For the reasons that follow, I shall grant the Motion to Amend, deny the Motion to Strike, deny the Motion, and grant the Cross Motion.

## I.     Factual and Procedural Background[5]

### A.  Bero's Employment at Aerotek and Aston

Allegis is the parent company of Aston. ECF 1, ¶ 1.  Specifically, Aston is a wholly owned subsidiary of Aerotek, and Aerotek is a wholly owned subsidiary of Allegis. ECF 71-2 (Celeste Slifer Dep.) at 13-14 (Tr. at 41-42).[6]

---

[5] Throughout the Memorandum Opinion, the Court cites to the electronic pagination. However, the electronic pagination does not always correspond to the page number imprinted on a particular submission.

[6] Slifer is the Vice President of Finance for Allegis.  ECF 71-2 at 6 (Tr. at 11).

Both Aston and Aerotek provide temporary and direct placement staffing services. ECF 71-1 (Bero Dep.) at 15 (Tr. at 46-47). In particular, Aston and Aerotek are engaged in the business of recruiting, employing, and providing the services of professional and other personnel on a temporary or permanent basis to companies throughout the United States. ECF 65-3 (Anthony Corpuz Decl.), ¶ 2.[7]

Bero began working for Aerotek in 2012 as a Customer Service Associate in the Los Angeles metropolitan area. *See* ECF 27 (Answer), ¶ 18; *see also* ECF 70-2 (Defendant's Response to Plaintiffs' Statement of Facts), ¶ 3.[8] While at Aerotek, Bero recruited candidates for administrative, human resources, and billing positions. ECF 71-1 at 14 (Tr. at 41-42).

Bero received multiple promotions during his nearly ten-year career with Aerotek. In particular, he was promoted to Recruiter, Contracts Manager, Account Manager, and Divisional Practice Lead. *See* ECF 27 at 3, ¶ 18; *see also* ECF 70-2, ¶ 4. Then, in June 2019, he was elevated to Divisional Practice Lead. ECF 65-3, ¶ 6. Based upon attainment of a leadership role with Aerotek, Bero became eligible to participate in the IGP. ECF 27, ¶ 30.

Bero relocated to Nashville, Tennessee in April 2020, as an Aerotek employee. ECF 71-1 at 25 (Tr. at 86).  His sales territory then shifted from the Los Angeles metropolitan area to the Nashville area.  ECF 71-1 at 9 (Tr. at 24-25); *see also* ECF 70-2, ¶ 21. Bero joined an existing team of Aerotek employees assigned to an office in Franklin, Tennessee. ECF 65-3, ¶ 7; *see also* ECF 71-3 (Corpuz Dep.) at 15 (Tr. at 48-49). As a divisional practice lead in the Nashville office, Bero managed employees from Tennessee, Kentucky, Ohio, and Arkansas. ECF 71-1 at 16 (Tr. at

---

[7] Corpuz serves as the "Director of Market Operations for Aston Carter, Inc." ECF 65-3, ¶ 2. He held this same position with Aerotek. *Id.*

[8] The Aerotek office was located in Torrance, California. *See* ECF 71-1 at 23 (Tr. at 79-80); *see also* ECF 70-2, ¶ 3.

51). His management role involved teaching sales techniques, assisting with sales, motivating employees, and helping employees meet their goals. *Id.* In addition to Bero's management responsibilities, he continued "selling" staffing services. ECF 71-1 at 16 (Tr. at 51).

Bero worked in this capacity for Aerotek until January 2021. ECF 70-5 (Bero Decl.) at 2, ¶ 2. At that time, Allegis transferred Bero to Aston. *Id.*, ¶ 5.

When Bero commenced employment with Aston, the company's business focused on the labor categories of accounting and finance, operations and administrative, and customer support. ECF 71-3 at 14 (Tr. at 42). Allegis entities other than Aston were responsible for other labor categories, such as "crafts and labor and production," engineering, and sciences. *Id.* at 15 (Tr. at 48). Bero claims that, as an Aston employee, his focus remained on professional services. ECF 71-1 at 10 (Tr. at 27). But, he was limited to servicing the particular labor categories that Aston provided. ECF 71-3 at 15 (Tr. at 48). Moreover, his sales territory was limited to the Nashville area, although as a manager he supervised employees in Ohio, Arkansas, Kentucky, and Tennessee. ECF 71-1 at 16 (Tr. at 51-52).

### B. Bero's Employment at Jobot

In December 2021, Drew Fibus, an executive at Jobot, began recruiting Bero through LinkedIn, a social media networking platform for professionals. ECF 71-1 at 21 (Tr. at 70); *see also* ECF 67-1 (Jobot's internal communications detailing Fibus's conversations with Bero). Then, in early January 2022, Bero had a phone conference with Jobot's CEO, Heidi Golledge. ECF 71-1 at 33 (Tr. at 119-120); *see also* ECF 65-2 at 6-7 (text message between Golledge and Bero). On January 17, 2022, Jobot extended a formal job offer to Bero. *See* ECF 65-2 at 7. Bero accepted an Executive Manager position with Jobot on January 24, 2022. ECF 71-1 at 53 (Tr. at 201); *see id.* at 38 (Tr. at 138).

On January 28, 2022, Bero emailed Corpuz to provide two weeks' notice of his resignation. ECF 65-5 at 3. But, Aston terminated Bero on February 3, 2022. ECF 70-5 at 3, ¶ 9. Bero commenced employment at Jobot on February 14, 2022. ECF 71-1 at 10 (Tr. at 26).

As a condition of Bero's employment contract with Jobot, he agreed to a "CONFIDENTIAL AND PROPRIETARY INFORMATION AND INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT" prohibiting him from using any of his former employer's confidential information or trade secrets. ECF 71-4, ¶ 2I. Similarly, Jobot's new and prospective employee protocols, to which Bero agreed, prohibit Bero's use of his former employer's confidential information. *See* ECF 71-5 ("JOBOT NEW EMPLOYEE PROTOCOLS"); ECF 71-6 ("JOBOT PROSPECTIVE EMPLOYEE PROTOCOLS").

Between January 7 and February 1, 2022, during the period when Jobot was recruiting Bero and after he accepted the offer of employment, Bero sent four emails from his Aston email account to his personal Gmail account. ECF 70-5 at 3, ¶ 10. He claims that he did so because he was experiencing computer problems at work and he wanted to continue working on projects for Aston in the event that his computer "crashed."  ECF 70-1 at 12; *see also* ECF 70-5 at 3, ¶ 10; ECF 71-1 at 78 (Tr. at 300).  Unsurprisingly, Bero denies that he was preparing to compete with Aerotek or Aston.  Rather, he insists that he merely "intended to use the information . . . for purposes related to his employment at Aston . . . ." ECF 70-1 at 12; *see id.* at 13.  At his deposition, however, Bero could not recall whether he enlisted the assistance of the IT department to resolve the issues with his computer. ECF 71-1 at 79 (Tr. at 304).

Bero first sent an email to his Gmail account on January 7, 2022.  ECF 67-8.  It included a spreadsheet titled "Copy of Spread Negotiations Tool.xls."  *Id.* The spreadsheet is a calculator tool that is used to "make quick calculations during negotiations." ECF 70-5 at 4, ¶ 11.

6

The second email, sent on January 20, 2022, is titled "BoB" and includes a spreadsheet labeled "new book of biz.xlsx." ECF 67-3. The spreadsheet contains the names of fifteen companies and eighteen individuals associated with these companies, as well as an email and/or phone number for five of the individuals. *Id.*

The third email, sent on January 26, 2022, was a forwarded email chain between Bero and Freddie Brouse at Schneider Electric, dated January 20 and January 21, 2022. ECF 67-6. The emails concerned a potential requisition for ETAP, a software company that is a subsidiary of Schneider Electric. *Id.*

Finally, on February 1, 2022, Bero forwarded another email from Brouse, dated January 31, 2022. ECF 67-7. It concerned a Sales/Operations Manager position. *Id.*

After Bero left Aston, he drafted a spreadsheet on his personal laptop called "BoB.xlsx." ECF 70-5 at 5-6, ¶ 19. On February 14, 2022, Bero emailed the spreadsheet from his personal Gmail account to his Jobot email. ECF 71-1 at 53 (Tr. at 199). As discussed *infra*, the parties dispute Bero's method for creating the "BoB.xlsx" spreadsheet. But, Bero asserts that the "spreadsheet never existed on Aston Carter's or Aerotek's systems. . . ." ECF 70-1 at 14.

The "BoB" spreadsheet contained two tabs. ECF 67-4 at 3-5. One tab is a list of companies that Bero planned to contact on his first day at Jobot, divided by industry. ECF 70-5 at 6, ¶ 20. He asserts that they "had nothing to do with his work" for plaintiffs. ECF 70-1 at 14. The other tab is labeled "old contacts." ECF 70-5 at 6, ¶ 21. It contains eleven rows and two columns. ECF 67-4. The first column references nine companies, some by initials, with the other two lines indicating "5 companies" and "???" *Id.* The second column contains a list of first names only for each company listed, with one missing a name and having only a question mark. *Id.*

After leaving Aston Carter, Bero reached out by phone to some of the people listed on the "old contacts" tab, including Alfonso Vides and Freddie Brouse.  ECF 70-5 at 6, ¶ 22.   He asserts that he had their contact information on his personal phone. *Id.*  In addition, Bero reached out to Kevin Hemberger, an individual with whom Bero had a previous work relationship. ECF 71-1 at 65 (Tr. at 248-49).

On February 25, 2022, two weeks after Bero began his employment at Jobot, an associate general counsel for Allegis, Michael Cianfichi, Esq., called Bero. *See* ECF 70-11 (Cianfichi Dep.) at 4, 20 (Tr. at 8, 41). At the time, Cianfichi was aware of an ongoing investigation into Bero's emails and devices. *Id.* at 8 (Tr. at 12). Cianfichi also knew that Bero had sent certain spreadsheets and other communications from his Aston email address to his Gmail address. *Id.* at 8-9, 11 (Tr. at 12-13, 19). Nevertheless, Cianfichi did not ask Bero to return or delete any emails or documents. *See id.* at 10, 20 (Tr. at 18, 41); *see also* ECF 70-12 at 2-3 (Cianfichi's notes from phone call with Bero).**.**

### C.  The Employment Agreement

As noted, in January 2021, Allegis transferred Bero to Aston.  As discussed, Aston is a wholly owned subsidiary of Aerotek, and Aerotek is a wholly owned subsidiary of Allegis.  ECF 71-2 at 13-14.

The Employment Agreement was drafted by or for Aston; Bero asserts that he did not negotiate any of the terms or make any changes. ECF 70-5 at 2-3, ¶ 7. Bero and Aston executed the Employment Agreement on February 17, 2021. ECF 1-1 at 2.  It is about seventeen pages in length.  Under the terms of the Employment Agreement, Bero was an "at will" employee.  *Id.* Therefore, his employment would "continue until terminated by either party."  *Id.*

The Employment Agreement's preamble states that, as part of Bero's employment with Aston, he would "(a) become intimately involved with and knowledgeable of COMPANY's Confidential Information; (b) become personally acquainted with and have regular access to COMPANY's Business relationships including but not limited to its customers; and (c) receive COMPANY's unique and specialized training . . . ." *Id.*

The Employment Agreement also indicates that Aston's business of "recruiting, sales, employing, and providing the services of professional, financial, call center, and/or other personnel on a temporary, contract, contract to permanent, or permanent basis to companies and other entities throughout the United States and other countries" is "highly competitive." *Id.* And, the preamble states that Aston's "Confidential Information" is to be "solely and strictly used for COMPANY's exclusive benefit." *Id.* at 3.

Pursuant to the Employment Agreement, Bero agreed that his "special position of trust and confidence necessitates the restrictions in this Agreement." *Id.* at 4. Several covenants in the Employment Agreement are relevant here.

Paragraph 4 provides, in part:

**NON-SOLICITATION COVENANT**: EMPLOYEE agrees that upon the termination of EMPLOYEE's employment, whether by COMPANY or EMPLOYEE and whether with or without cause, for the Restricted Period EMPLOYEE shall not directly or indirectly:

(a) Communicate with any individual or entity which is a Covered Customer for the purpose of:

(i) entering into any business relationship with such Covered Customer if the business relationship is competitive with any aspect of COMPANY's Business (or any COMPANY affiliate which employed EMPLOYEE during the Look Back Period) for which EMPLOYEE performed services or about which EMPLOYEE obtained Confidential Information during the Look Back Period, or

> (ii)   reducing or eliminating the business such customer conducts with COMPANY (or any COMPANY affiliate which employed EMPLOYEE during the Look Back Period) . . .

The terms "Covered Customer" and "Look Back Period" are defined terms.  They are discussed, *infra*.

Paragraph 6 provides, in part:

> **COVENANT NOT TO DIVULGE CONFIDENTIAL INFORMATION:** Employee covenants and agrees that, except as required by the proper performance of EMPLOYEE's duties for COMPANY, EMPLOYEE shall not use, disclose or divulge any Confidential Information of COMPANY (or any COMPANY affiliate which employed EMPLOYEE during the Look Back Period) to any other person or entity besides COMPANY. For purposes of this Agreement, "Confidential Information" shall mean information not generally known by the competitors of COMPANY or the general public concerning COMPANY's Business that COMPANY takes reasonable measures to keep secret, including but not limited to: financial information and financial controls; sales and marketing strategies; acquisition plans; pricing and costs; customers' names, addresses, e-mail addresses, telephone numbers, and contact persons; customers' staffing requirements; margin tolerances regarding pricing; the names, e-mail addresses, addresses, telephones numbers, skill sets, availability and wage rates of Contract Employees; sales, recruiting, pricing and marketing techniques; sales and recruiting manuals; forms and processes for acquiring and recording information; management analysis of salaries based on market competitiveness, employee compensation, and performance evaluations of Regular Employees; and management practices, procedures and processes. These restrictions on use or disclosure of Confidential Information will only apply for two (2) years after the end of EMPLOYEE's employment where information that does not qualify as a trade secret is concerned. The restrictions will apply to trade secret information for as long as the information remains qualified as a trade secret . . . .

In paragraph 7, the Employment Agreement states, in part:

> **RETURN AND PRESERVATION OF RECORDS:** Employee agrees, upon termination of EMPLOYEE's employment with COMPANY for any reason whatsoever or sooner if requested, to return to COMPANY all records and other property (whether on paper, computer discs or in any other form and including, but not limited to, Confidential Information), and copies thereof, belonging or pertaining to COMPANY (collectively "Company Records"), subject to Paragraph 16. EMPLOYEE further agrees not to engage in any unauthorized destruction or deletion of Company Records during employment or upon termination of employment, including, without limitation, the deletion of electronic files, data, records or e-mails . . . EMPLOYEE will take such steps requested by COMPANY

to inspect and confirm that Company Records have been removed or deleted from all storage places, equipment, devices or accounts in EMPLOYEE's control . . . .

Notably, paragraph 3 is titled "Non-Compete Covenant." ECF 1-1 at 5. But, Aston has not asserted a claim based on this provision. *See* ECF 50-1 at 13, ¶ 52.

Bero also agreed that the ". . . COMPANY and its parent, subsidiaries, Affiliates, and divisions that EMPLOYEE provides services to or is provided Confidential Information about are all intended beneficiaries of this Agreement, including TEKsystems, Aston Carter, Allegis Global Solutions, and EASi, and shall be treated the same as COMPANY for purposes of all of the protections provided for in this Agreement . . . ." ECF 1-1 at 13, ¶ 15.

### D.  The IGP[9]

The IGP is an incentive plan offered to certain employees of Allegis and its participating affiliates. ECF 1-2 at 2, ¶  1.1. Its purpose is to "[p]rovide a competitive compensation package to assist in the recruitment and retention of top performing Key Employees." *Id.* ¶ 1.1(a). Through the IGP, a participating employee can earn "Investment Units," which have "a specified Value that is credited to a Participant's Account if the terms and conditions of an Award are satisfied." *Id*. at 39, ¶  2.22. The "Value" of an Investment Unit is "equal to a fixed dollar amount at the time of an Award and thereafter adjusted by the Committee to reflect positive or negative changes" based on various financial factors. *Id*. at 10, ¶ 2.32.

The Investment Units are "earned and become payable" upon the earlier of "(i) the fifth anniversary of the Award Date (or such other date as may be specified in the applicable Award Agreement), (ii) the Participant's death or Disability, or (iii) the Participant's Separation from

---

[9] The IGP is a twenty-page document.  I reference only a handful of its provisions.

Service." *Id*. at 13, ¶ 6.1. The IGP provides that payment "shall be made no later than sixty (60) days after the occurrence of the event triggering the right to receive payment." *Id*. at 14, ¶ 6.1.

The IGP states that "[t]he obligation of the Company to make the payments with respect to an Award" is a "contractual obligation" of "the Company," and that a participant "shall look solely to the general credit of the Company for satisfaction of any obligations due or to become due with respect to Investment Units or under an Award or the Plan." *Id*. at 19, ¶ 11.2.  The term "Company" is defined as "Allegis Group, or any successor thereto by merger, consolidation or otherwise, which may agree to continue the Plan, or any Affiliate that adopts the Plan with the approval of the Committee." *Id.* at 5, ¶ 2.15.  "Affiliate" means "affiliates, subsidiaries, and related companies" of Allegis.  *Id.* at 3, ¶ 2.2.  "Board" means the Board of Directors of Allegis.  *Id.* ¶ 2.9. "Committee" means "the Board, or other committee designated by the Board to administer the Plan." *Id*. at 3-4, ¶¶ 2.9, 2.12.  And, "Plan" refers to the IGP.  *Id.* at 10, ¶ 2.30.

Subject to approval by the Committee, any Affiliate may adopt the IGP.  *Id.* at 18, ¶ 10.1. Furthermore, the IGP states, *id. ¶* 10.2:

> It is intended that the provisions of the Plan shall apply separately to each participating Company, if there be more than one, and to the Participants of each such participating Company, and, unless the context otherwise requires, the term "Company" as used throughout the Plan shall be so construed, to the end that, except as otherwise provided in this Article 10, the Plan shall constitute a separate Plan for each participating Company.

The Plan also states, *id.* ¶ 10.3:

> Each Company shall be obligated to pay compensation under this Plan to its own employees who are Participants in this Plan, and neither Allegis Group nor any other Company shall be obligated to fulfill the obligations of a Company to such Company's employees under this Plan.

Allegis's "Committee" plays an administrative role with respect to the Plan and has the "full power, authority, and discretion to administer and interpret the provisions of the Plan." *Id*. at 10-11, ¶¶ 3.1, 3.2. For example, the Committee determines when payments are made. *Id.* at 10,

¶ 3.2(v). And, a participant must submit a claim to the Committee, not to the participating company, if he or she "believes" that he or she is entitled to a benefit under the Plan . . . ." *Id.* at 15-16, ¶ 8.1.

Of relevance here, "Awards under the Plan are conditioned on the Participant not (i) engaging in a Competitive Activity during the Participant's term of employment or during the eighteen (18) month period following his or her Separation from Service, or (ii) committing a Confidentiality Violation." *Id.* at 14, ¶ 6.2. If "a Participant engages in either a Competitive Activity during the Participant's term of employment or during the eighteen (18) month period following his or her Separation from Service or commits a Confidentiality Violation, the Participant shall be deemed not to have earned any Investment Units; shall forfeit all of the Investment Units credited to his or her Account; and shall be required to repay to the Company any and all amounts paid to the Participant in accordance with this Article 6 before the date the Participant engaged in the Competitive Activity or committed the Confidentiality Violation." *Id.*

The definition of "Competitive Activity" exceeds more than one page of ECF 1-2.  It includes, *inter alia*, the following activities, *id.* at 6, ¶ 2.16(a)(b)(i):

> (a)     Engaging in any aspect of the Companies' Business in which the Participant performed work or about which the Participant obtained Confidential or Proprietary Information during the two (2) year period preceding his or her Separation from Service, within a radius of two hundred fifty (250) miles of the office in which the Participant last worked or any other office in which the Participant worked during the two (2) years preceding his or her Separation from Service;

> (b)     Approaching, contacting, soliciting or inducing any individual, corporation or other entity which is a client or customer of any of the Companies, about which Participant obtained knowledge by reason of Participant's employment by the Companies, in an attempt to:

> (i)     enter into any business relationship with a client or customer of any of the Companies if the business relationship is competitive with any aspect of the Companies' Business in which Participant worked during the two (2) year period preceding his or her Separation from Service . . . .

The definition of "Confidential or Proprietary Information" is about one page in length. *See id.* at 7, ¶ 2.17.  It includes trade secrets and all other information, in any form, if the Company uses reasonable measures to maintain the information's "secrecy." *Id.* ¶ 2.17(a). And, a Confidentiality Violation is defined in paragraph 2.18. *Id.* at 8. This paragraph prohibits, *inter alia*, "the failure of the Participant to keep confidential any Confidential or Proprietary Information," *id.* ¶ 2.18(a), and "the Participant's misappropriation of any Confidential or Proprietary Information," *id.* ¶ 2.18(b).  In addition, it includes the violation of any confidentiality provision in the employee's employment agreement. *Id.* ¶ 2.18(c).

Bero began participating in the IGP in 2019.  ECF 65-1 at 10, ¶ 13.  He earned four awards under the Plan while employed by Aerotek. *See* ECF 65-2 at 45, 46, 47, 48. But, he did not earn any Awards while he was employed by Aston. ECF 70-5 at 3, ¶ 8.

The awards letters are all identical, save for the amount and dates. *See* ECF 65-2 at 45, 46, 47, 48.  Each is titled "Performance Award Agreement." *See id.* As a condition of acceptance of the Investment Units, *i.e.* the awards, Bero was required to agree to the terms and conditions of the IGP. *See id.* ¶¶ 2, 4. And, a copy of the IGP was included with each award letter. *See id.* ¶ 2. Furthermore, Aerotek was explicitly named as the "Company" in all the awards letters. *See id.* ¶ 1. Bero has not submitted a claim to the Committee for IGP benefits.  ECF 65-1 at 10, ¶ 13.

Additional facts are included, *infra*.

## II.   Motion to Amend

On November 8, 2022, plaintiffs moved to amend the Complaint. ECF 50.  They seek to add a claim in Count I against Bero for breach of the Non-Solicitation Covenant, contained in paragraph 4 of the Employment Agreement. *See* ECF 50; ECF 50-2, ¶¶ 4, 30, 50, 52.

### A.  Factual and Procedural Background

Suit was filed on March 23, 2022.  ECF 1.  Soon after, on April 6, 2022, the Court held a telephone conference with counsel to discuss the proposed schedule for the case.  *See* Docket.  On that date, the Court issued a Scheduling Order.  ECF 24.  Among other things, the Scheduling Order set a deadline of June 30, 2022, for amendment of pleadings, and a discovery deadline of October 28, 2022.  *Id.* at 1.

By Order of October 6, 2022 (ECF 48), the Court approved the parties' stipulation of September 13, 2022 (ECF 47), extending the discovery deadline to December 12, 2022, and the dispositive motions deadline from December 2, 2022 to January 16, 2023. ECF 48.  But, the amendment deadline was not changed.

On April 25, 2022, about a month after suit was filed, plaintiffs gave notice of their intent to serve a subpoena duces tecum on Jobot, pursuant to Fed. R. Civ. P. 45(a)(4). *See* ECF 55-1. The subpoena called for the production of documents at the office of plaintiffs' counsel in Philadelphia. *Id*. at 4. Jobot filed objections to the subpoena on May 11, 2022. *See* ECF 55-2. In particular, Jobot asserted that the subpoena improperly called for production at a location more than 100 miles from Jobot's headquarters in Irvine, California, in violation of Fed. R. Civ. P. 45(c)(2)(A). *Id.* at 2. Jobot also objected to the subpoena as "unduly burdensome," because it sought documents that could otherwise be obtained from a party to the litigation. *Id.* at 3.

Bero's initial production of documents occurred on June 17, 2022, and a supplemental production was made on June 21, 2022. *See* ECF 59-1.  On June 22, 2022, after plaintiffs determined that Bero's production was insufficient (ECF 55-4), plaintiffs responded to Jobot's objections to the third-party subpoena. *See* ECF 55-3. Jobot responded several days later, on June 27, 2022, indicating its intent to comply voluntarily with the production request, without waiving

its various objections. *See* ECF 55-5. Jobot produced the documents on July 22, 2022. *See* ECF 51 at 7; ECF 55 at 1; ECF 59 at 3.

Soon after, on August 10, 2022, Bero was deposed. ECF 55 at 4. Based on the Jobot document production of July 22, 2022, he was asked about the solicitation of customers. ECF 51 at 3.

Throughout August and September of 2022, counsel for Jobot and the lawyers for plaintiffs conferred about Jobot's objections. *See* ECF 55-6. Then, in October 2022, plaintiffs informed Bero of their intent to file an amended complaint. *See* ECF 55-7 at 2. On November 2, 2022, Jobot produced several additional documents. ECF 55 at 5; ECF 59 at 3.

As noted, plaintiffs moved to amend on November 8, 2022.  ECF 50. That motion was filed three months beyond the deadline in the Scheduling Order, with about one month of discovery remaining. *See* ECF 24; ECF 48.

### B.  Amendment of Pleadings Generally

Pursuant to Rule 15(a) of the Federal Rules of Civil Procedure, "[a] party may amend its pleading once as a matter of course within: A) 21 days after serving it, or B) if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier." Fed. R. Civ. P. 15(a)(1). "In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). However, Rule 15(a)(2) "provides that courts 'should freely give leave' to parties to amend pleadings 'when justice so requires.'" *Sohrabi v. Mirghahari*, GJH-20-2001, 2023 WL 1416020, at *2 (D. Md. Jan. 31, 2023) (citing Fed. R. Civ. P. 15(a)(2)).

"This liberal rule gives effect to the federal policy in favor of resolving cases on their merits instead of disposing of them on technicalities." *Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006). Ultimately, "[t]he decision whether to grant leave to amend a pleading generally falls within the sound discretion of the district court." *Medigen of Ky., Inc. v. Pub. Serv. Comm'n of W.Va.*, 985 F.2d 164, 167 (4th Cir. 1993) (citing *Nat'l Bank v. Pearson*, 863 F.2d 322, 327 (4th Cir. 1988)).

The Fourth Circuit has interpreted Rule 15(a) to provide that "leave to amend a pleading should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile." *Johnson v. Oroweat Foods Co*., 785 F.2d 503, 509 (4th Cir. 1986); *see Equal Rts. Ctr. v. Niles Bolton Assocs*., 602 F.3d 597, 603 (4th Cir. 2010) (stating that leave to amend may be denied where the proposed amendment "would be prejudicial to the opposing party, the moving party has acted in bad faith, or the amendment would be futile"); *see also Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 674 F.3d 369, 379 (4th Cir. 2012); *Medigen of Ky., Inc*., 985 F.2d at 168. Thus, a district court "'may deny leave if amending the [pleading] would be futile—that is, if the proposed amended [pleading] fails to satisfy the requirements of the federal rules." *Katyle v. Penn Nat'l Gaming, Inc*., 637 F.3d 462, 471 (4th Cir. 2011) (quoting *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 376 (4th Cir. 2008)) (alterations added).  And, an amendment is futile "when the proposed amendment is clearly insufficient or frivolous on its face." *Johnson*, 785 F.2d at 510.

Fed. R. Civ. P. 16 concerns scheduling and case management. Where a party "moves to amend after the deadline established in the scheduling order for doing so, Rule 16(b)(4) becomes the starting point in the Court's analysis." *Wonasue v. Univ. of Md. Alumni Ass'n*, 295 F.R.D. 104, 106 (D. Md. 2013); *see Faulconer v. Centra Health, Inc*., 808 F. App'x 148, 152 (4th Cir. 2020).

Rule 16(b)(4) provides: "A schedule may be modified only for good cause and with the judge's consent." Thus, Rule 16 "recognize[s] . . . that the parties will occasionally be unable to meet . . . deadlines [in a scheduling order] because scheduling order deadlines are established relatively early in the litigation." *O'Connell v. Hyatt Hotels of Puerto Rico*, 357 F.3d 152, 154 (1st Cir. 2004) (citation omitted). "Effectively, if amendment of the pleadings would satisfy Rule 16(b)(4)'s good cause standard, then it would also satisfy Rule 15(a)(2)'s freely given standard." V*arner v. South Carolina Farm Bureau Ins. Co.*, TLW-18-2098, 2020 WL 12834378, at *1 (D.S.C. Oct. 2, 2020).

Scheduling orders serve a vital purpose in helping a court to manage its civil caseload. *Gestetner Corp. v. Case Equip. Co*., 108 F.R.D. 138, 141 (D. Me. 1985); *see also Naughton v. Bankier*, 114 Md. App. 641, 653, 691 A.2d 712, 718 (1997) (recognizing that a scheduling order helps "to maximize judicial efficiency and minimize judicial inefficiency"). A scheduling order is an important vehicle in "'securing the just, speedy, and inexpensive determination of every action.'" *Miller v. Transcend Servs., Inc*., LPA-10-362, 2013 WL 1632335, at *4 (M.D.N.C. Apr. 16, 2013) (quoting *Marcum v. Zimmer*, 163 F.R.D. 250, 253 (S.D. W. Va. 1995)).

Under Rule 16(b)(4), a movant must demonstrate good cause to satisfy the requirement for a modification of the scheduling order. *See Faulconer*, 808 F. App'x at 152; *Nourison Rug Corp. v. Parvizian*, 535 F.3d 295, 298 (4th Cir. 2008); *Wonasue*, 295 F.R.D. at 106–07; *see also United States v. Hartford Accident & Indem. Co*., JKB-14-2148, 2016 WL 386218, at *5 (D. Md. Feb. 2, 2016) ("The burden for demonstrating good cause rests on the moving party."). The "'touchstone'" of Rule 16(b)(4)'s "good cause requirement is 'diligence.'" *Faulconer*, 808 F. App'x at 152 (citation omitted).

## C.  Discussion

According to plaintiffs, ongoing discovery disputes resulted in a "discovery dance" that delayed their "acquisition of the evidence forming the basis for amendment." ECF 51 at 4. In particular, plaintiffs assert that Jobot's production on July 22, 2022—which occurred several weeks after the amendment deadline of June 30, 2022—"revealed that after beginning employment with Jobot, Bero engaged in prohibited contacts with Aston Carter clients, in apparent violation of both the Employment Agreement and IGP."  ECF 51 at 2; ECF 59 at 3. Further, plaintiffs assert that Jobot did not complete production of the requested documents until November 2, 2022.  ECF 51 at 2.[10]  And, plaintiffs contend that the documents produced on November 2 "suggest[ed] that Bero [was] recruiting for positions within the geographic area rendered off-limits by the IGP . . . ." ECF 51 at 7.

Plaintiffs moved on November 8, 2022, to amend Count I of their original Complaint to allege that Bero failed "to comply with [a] valid and enforceable covenant[] requiring . . . the non-solicitation of certain clients." ECF 50-2 at 14, ¶ 52.[11] But, plaintiffs did not identify in their Motion to Amend which documents they obtained from Jobot that warranted the belated amendment. *See* ECF 50; ECF 51.

---

[10]  Page two of the memorandum supporting plaintiffs' Motion to Amend states that "Jobot did not complete its production under the subpoena until Wednesday afternoon, November 2, 2022." ECF 51 at 2.  Plaintiffs' reply likewise refers to Jobot's "November 2, 2022 production." ECF 59 at 3.  However, plaintiffs' Motion to Amend purports to describe "[t]he substance of Jobot's November 4, 2022 production." ECF 51 at 7.  I assume that the production described there is, in fact, the production of November 2, 2022.

[11] Plaintiffs also amended the section of their complaint titled "Nature Of This Action" to state that, "[w]ithin days of starting at Jobot, Bero began soliciting customers he previously worked with at Aston Carter, in clear violation of the non-solicitation provisions of his IGP and his Aston Carter Employment Agreement." ECF 50-2 at 3, ¶ 4.  However, plaintiffs did not amend Count II (Breach of IGP Agreement) to allege a violation of the IGP's non-solicitation provision. *Id.* at 14-15, ¶¶ 57-61.

Bero urges the Court to deny leave to amend on the basis that plaintiffs failed to exercise diligence. In particular, defendant notes the following "delays and lack of diligence," ECF 55 at 5-6 (form in original):

- Plaintiffs' delay until June 22 to follow up on Jobot's May 11 objections to their subpoena;
- Plaintiffs' refusal to change the location of compliance, which would have resulted in an earlier production of documents from Jobot;
- Plaintiffs' failure to seek to modify the scheduling order when they knew on June 27 that Jobot's document production would be two weeks after the June 30 amendment deadline;
- Plaintiffs' failure to move to amend at any time between July 22 and November 8, even though they possessed all the documents that provide the basis for their amendments on July 22;
- Plaintiffs' further failure to move to amend after deposing Bero on these very same documents on August 10;
- Plaintiffs' failure to follow up on the objections that Jobot maintained until August 19, a month after Jobot's then-final document production and almost two months after they were told exactly which documents Jobot would agree to produce and which objections it would stand on;
- Plaintiffs' failure to move to amend earlier even though Plaintiffs told Bero's counsel of their desire to amend as early as October 3;
- Plaintiffs' further delay in following up on its request until October 28;
- Plaintiffs' further delay until November 8 in filing its motion despite having Bero's confirmed opposition on November 1.

In reply, plaintiffs argue that defendant understates the difficulties plaintiffs encountered in obtaining Jobot's document production, specifically as to the disclosure of November 2, 2022. ECF 59 at 3.  Plaintiffs observe that Bero and Jobot are represented by the same counsel, and they claim that, had Bero and Jobot responded appropriately to production requests, such a delay would not have been necessary. *Id.* at 4.  Further, they argue that although diligence is an important factor in determining whether to permit amendment after a deadline, it is not the only factor that courts consider. *Id.*

Plaintiffs must first satisfy the standards of Fed. R. Civ. P. 16, which governs amendment of pleadings filed beyond the deadline set forth in a scheduling order. As the Fourth Circuit has

said, "after the deadlines provided by a scheduling order have passed, the good cause standard" under Rule 16 "must be satisfied to justify leave to amend the pleadings." *Nourison*, 535 F.3d at 298; *see also Cook v. Howard*, 484 F. App'x 805, 814-15 (4th Cir. 2012) (stating that Rule 15(a)(2) "applies . . . prior to the entry of a scheduling order, at which point, under Rule 16(b)(4), a party must first demonstrate 'good cause' to modify the scheduling order deadlines, before also satisfying the Rule 15(a)(2) standard for amendment."); *Odyssey Travel Ctr., Inc. v. RO Cruises, Inc.*, 262 F. Supp. 2d 618, 631 (D. Md. 2003) ("[O]nce the scheduling order's deadline for amendment of the pleadings has passed, a moving party first must satisfy the good cause standard of Rule 16(b); if the moving party satisfies Rule 16(b), the movant then must pass the tests for amendment under [Rule] 15(a).").

In *Nourison*, 535 F.3d at 298, the Fourth Circuit explained:

> There is tension within the Federal Rules of Civil Procedure between Rule 15(a) and Rule 16(b) . . . Rule 15(a) provides that leave to amend "shall be freely given when justice so requires." A motion to amend should be denied only where it would be prejudicial, there has been bad faith, or the amendment would be futile. *HCMF Corp. v. Allen*, 238 F.3d 273, 276–77 (4th Cir. 2001). On the other hand, Rule 16(b) provides that "a schedule shall not be modified except upon a showing of good cause and by leave of the district judge."

The Scheduling Order (ECF 24) and the amendment to it (ECF 48) are important to the analysis. A scheduling order is not a "'frivolous piece of paper, idly entered, which can be cavalierly disregarded by counsel without peril.'" *Potomac Elec. Power Co. v. Elec. Motor Supply, Inc.*, 190 F.R.D. 372, 375-76 (D. Md. 1999) (quoting *Gestetner Corp.*, 108 F.R.D. at 141). As indicated, scheduling orders serve a vital purpose in helping courts manage their civil caseloads. *Gestetner Corp.*, 108 F.R.D. at 141; *see also Naughton*, 114 Md. App. at 653, 691 A.2d at 718 (noting that a scheduling order helps "to maximize judicial efficiency and minimize judicial inefficiency"). "In an era of burgeoning case loads and thronged dockets, effective case management has become an essential tool for handling civil litigation." *Tower Ventures, Inc. v.*

*City of Westfield*, 296 F.3d 43, 45 (1st Cir. 2002). Thus, as stated, a scheduling order is an important vehicle in "'securing the just, speedy, and inexpensive determination of every action.'" *Miller*, 2013 WL 1632335, at *4 (citation omitted).

Modification of a scheduling order requires good cause. Fed. R. Civ. P. 16(b)(4). And, as noted, the "touchstone" of Rule 16(b)(4)'s "good cause requirement is diligence." *Faulconer*, 808 F. App'x at 152 (internal quotation marks omitted). Indeed, "only diligent efforts to comply with the scheduling order can satisfy Rule 16's good cause standard." *Id*. at 152; *see also id*. at 152 n.1 (collecting cases); *accord Rassoull v. Maximus, Inc*., 209 F.R.D. 372, 374 (D. Md. 2002) ("Lack of diligence and carelessness are 'hallmarks of failure to meet the good cause standard.'") (citation omitted).

In evaluating diligence, courts mainly focus "'[on] the timeliness of the motion to amend and the reasons for its tardy submission.'" *Elat v. Ngoubene*, 993 F. Supp. 2d 497, 520 (D. Md. 2014) (quoting *CBX Techs., Inc. v. GCC Techs., LLC*, JKB-10-2112, 2012 WL 3038639, at *4 (D. Md. July 24, 2012) (internal quotation marks omitted)) (alteration in *Elat*). "'Carelessness is not compatible with a finding of diligence and offers no reason for a grant of relief.'" *Wonasue*, 295 F.R.D. at 107 (quoting *CBX Technologies, Inc*., 2012 WL 3038639, at *4). If, for example, the "moving party knew of the underlying conduct giving rise to a claim but simply failed to raise it in an initial [pleading], then the party" has not acted diligently, and therefore "cannot establish good cause under Rule 16." *Faulconer*, 808 F. App'x at 152 (alteration added). By contrast, and relevant here, where "'at least some of the evidence needed for a [party] to prove his or her claim did not come to light until after the amendment deadline,' a [party] has 'good cause' for moving to amend at a later date." *Wonasue*, 295 F.R.D. at 107 (quoting *Tawwaab v. Va. Linen Serv., Inc*., 729 F. Supp. 2d 757, 768–69 (D. Md. 2010)) (alterations added).

To determine whether the moving party has met its burden to show good cause, a court may also consider "whether the moving party acted in good faith, the length of the delay and its effects, and whether the delay will prejudice the non-moving party." *Elat*, 993 F. Supp. 2d at 520. However, "'[i]f the movant has not been diligent in meeting the scheduling order's deadlines,' then other factors . . . generally will not be considered." *Faulconer*, 808 F. App'x at 152 (quoting *Kmak v. Am. Century Cos., Inc*., 873 F.3d 1030, 1034 (8th Cir. 2017)); *see also Rassoull*, 209 F.R.D. at 374 ("'If [the moving party] was not diligent, the inquiry should end.'") (citation omitted) (alteration added); *Marcum*, 163 F.R.D. at 254 ("'[T]he focus of the inquiry is upon the moving party's reasons for seeking modification. If that party was not diligent, the inquiry should end.'") (citation omitted) (emphasis removed).

The Court need not address Rule 15 unless Rule 16 is satisfied. But, if the moving party demonstrates good cause pursuant to Rule 16(b)(4), the movant must then "satisfy the liberal standard of Fed. R. Civ. P. 15(a)." *Humane Soc'y of the U.S. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, DKC-13-1822, 2016 WL 3668028, at *2 (D. Md. July 11, 2016); *see Cook*, 484 F. App'x at 814-15; *Wonasue*, 295 F.R.D. at 106-07.

The discovery dispute between plaintiffs and Jobot culminated in Jobot's document production on July 22, 2022, with some additional documents produced on November 2, 2022. Bero was deposed on August 10, 2022.  As Judge Gallagher said in *Brightview Group, LP v. Glynn*, SAG-21-3027, 2022 WL 743937, at *11 (D. Md. Mar. 11, 2022), "new information uncovered during the course of discovery constitutes good cause sufficient to satisfy the rigors of Rule 16, when such information is relayed to the Court promptly and diligently." *See also Timbers v. Telligent Masonry, LLC,* JKB-21-293, 2022 WL 17541751, at *8 (D. Md. Dec. 8, 2022) (noting the importance of production received after the deadline for amendments). However, "'a motion

to amend should be made as soon as the necessity for altering the pleading becomes apparent.'" *Howard v. Inova Health Care Servs.*, 302 F. App'x 166, 181 (4th Cir. 2008) (quoting *Deasy v. Hill*, 833 F.2d 38, 41 (4th Cir. 1987)).

Although plaintiffs argue that they were diligent in filing the Motion to Amend shortly after Jobot's additional production on November 2, 2022, it appears that plaintiffs were aware of the need to file the Motion to Amend nearly three months before that date.  Indeed, in their Motion to Amend, they assert that Jobot's document production on July 22, 2022, "revealed that after beginning employment with Jobot, Bero engaged in prohibited contacts with Aston Carter clients, in apparent violation of both the Employment Agreement and IGP."  ECF 51 at 2-3. Plaintiffs account for the delay by suggesting that it occurred during ongoing negotiations about Jobot's production of additional documents that tended to show Bero's indirect solicitations. *Id.* at 7-8. They observe that, had they moved to amend before receiving these documents, they would have risked having to seek leave to amend a second time. *Id.* at 8.

In my view, the plaintiffs did not act with perfect diligence.  But, I do not consider the delay so egregious as to justify denial of leave to amend. And, other factors favor granting leave to amend.

Certainly, there is no indication that plaintiffs acted in bad faith. *See Sall v. Bounassissi*, DKC-10-2245, 2011 WL 2791254, at *4 (D. Md. July 13, 2011). Furthermore, there is no indication that granting the Motion to Amend will prejudice Bero. Indeed, in the Motion and the Cross Motion, the parties have briefed the case as if the motion to amend were granted. *See Abitu v. GBG, Inc.*, PWG-17-8, 2018 WL 2023557, at *4 (D. Md. May 1, 2018) (considering whether granting a motion to amend the complaint will require "another round of dispositive motions practice on an entirely new issue of law").  Thus, granting the Motion to Amend will not delay the

resolution of this case.  And, significantly, defendant had notice of the First Amended Complaint while discovery remained open. *Cf. Honeywell International Inc. v. Opto Electronics Co., Ltd.*, KDB-21-506, 2023 WL 3029264, at *8 (W.D.N.C. Apr. 20, 2023) (denying motion to amend the complaint, in part, because it would require "discovery to be reopened").

As noted, the decision whether to grant leave to amend a complaint lies within the sound discretion of the district court. *Medigen of Ky., Inc.*, 985 F.2d at 167-68.  I am "persuaded that the amendment should have virtually no impact on the judicial proceedings to follow." *Winston v. Haziminas*, GJH-19-26, 2023 WL 1070469, at *2 (D. Md. Jan. 27, 2023).  Therefore, I shall grant the Motion to Amend (ECF 50).

### III.  Motion to Strike

Pursuant to Fed. R. Civ. P. 37(c)(1), Bero moves to exclude the expert deposition testimony of Gregory Freemyer, claiming that he was never disclosed as an expert by plaintiffs. ECF 73.  He also seeks to strike related exhibits.  *Id.*  Bero contends that he will be prejudiced by plaintiffs' belated disclosure of Freemyer's evidence, because it can be used "to rebut Bero's testimony that he did not access or use a particular spreadsheet after he left Aston Carter."  ECF 85 at 5.

#### A.  Relevant Background

As noted, the Court held a telephone conference with counsel on April 6, 2022, to discuss the proposed schedule. *See* Docket. Then, on that date, the Court issued a Scheduling Order. ECF 24. Among other things, the Scheduling Order set a deadline of July 29, 2022, for plaintiffs' disclosure of experts under Rule 26(a)(2). *Id.* at 1. Defendants' Rule 26(a)(2) disclosures were due by September 14, 2022. *Id*. And, plaintiffs' rebuttal Rule 26(a)(2) disclosures were due by September 28, 2021. *Id*.

On April 22, 2022, the parties jointly filed a "Stipulated Forensic Search Protocol" ("FSP"), twenty-four pages in length. ECF 33. The Court approved the FSP that same day. ECF 35 at 17.

According to the parties, the purpose of the FSP was, *inter alia*, to establish a protocol to remediate documents in Bero's possession that allegedly belonged to plaintiffs and to ensure Bero's compliance with his obligation to return and preserve records of his former employer. *See* ECF 33 at 1. As part of the FSP, the parties named "SullivanStrickler" as the "neutral digital forensic expert . . . ." *Id.* at 2, ¶ B.[12]  The parties denominated this person as the "Expert." *Id.*

The FSP also provided for a detailed "Forensic Report" to be provided by the Expert. *Id.* at 11-12. For example, the Expert was to analyze various devices that belonged to Bero to determine what data, if any, he downloaded, uploaded, accessed, shared, or transferred on or after September 2, 2021. *Id.* at 11, ¶ 3.

Notably, on October 13, 2022, counsel for Bero emailed plaintiffs and SullivanStrickler and asked plaintiffs to identify any files for which they sought deletion. ECF 70-13 at 2. On October 21, 2022, plaintiffs identified eight such files. ECF 70-14 at 2. And, SullivanStrickler confirmed that the files were deleted by November 2, 2022. *See* ECF 70-15 at 2; ECF 70-6 at 2.

On December 2, 2022, counsel for plaintiffs emailed Freemyer and Karuna Naik, both of whom are employees of SullivanStrickler. *See* ECF 81-2 at 4.  Counsel advised that he wanted to depose them "regarding certain findings in [their] neutral execution of the forensic protocol . . . ." *Id.*

---

[12]  In various emails in the record, the names of SullivanStrickler employees are immediately followed by "(SullivanStrickler LLC)." *See, e.g.,* ECF 81-2 at 2.

Then, on December 12, 2022, Aston disclosed in its third supplemental and amended response to defendant's interrogatory number one that a "corporate representative" for SullivanStrickler possessed personal knowledge of the facts alleged in the pleadings. ECF 81-3. This led to a Zoom meeting with counsel and representatives of SullivanStrickler on December 15, 2022. ECF 85-1 at 2-3. Immediately after the zoom meeting, Freemyer sent an email to all counsel. *Id.* at 2. He said, in part, *id.* (emphasis added):

> I was expecting the deposition to be treating SullivanStrickler as a fact witness as to what actions we performed, etc.
>
> **My impression now is that I will be testifying as an expert witness.**
>
> Is that correct?

Freemyer was deposed on January 3, 2023.[13]  *See* ECF 65-6.  Freemyer's testimony and related exhibits are the subject of the Motion to Strike, as Bero argues that Freemyer was not properly disclosed as an expert witness within the deadline provided in the Scheduling Order. Plaintiffs counter that, under Rule 26(a)(2), they were not obligated to disclose a neutral computer forensic examiner agreed upon by the parties "and appointed by the Court."  ECF 81 at 2.

At the deposition, the parties elicited testimony from Freemyer concerning the source of information for the "BoB" spreadsheet that Bero prepared.  *See* ECF 81-1 (Ex. A).  Bero avers that he prepared the document using independent online research, but plaintiffs assert that he created it by reference to a spreadsheet titled "Book of Business," which Bero sent from his Aerotek email address to his personal Gmail account in late 2020. *See* ECF 71-1 at 53 (Tr. at 199-200); ECF 65-6 at 25 (showing that "BookofBusiness" spreadsheet was accessed on the same day that the "BoB" spreadsheet was created).

---

[13] The cover page for the deposition transcript incorrectly indicates that the deposition occurred on January 3, 2022. ECF 73-2 at 2.

For his part, Freemyer answered questions from plaintiffs' counsel "about things like last access, last modified/created dates, last access dates, last modified dates that exist in various places within the metadata, the hash value and things of that nature." ECF 81-1 at 48 (Tr. at 92:17-21). He affirmed that the "BoB" spreadsheet saved on February 4th, 2022, was the same spreadsheet sent on February 14th, 2022, from Bero's personal Gmail address to his Jobot email address. *Id.* at 15 (Tr. at 42:8-11). However, Freemyer testified that he had "not seen any evidence to suggest that [the "BoB" spreadsheet] came from his [Bero's] Aerotek e-mail account or in any other way came from an Aerotek computer or computer system of any kind." *Id.* at 44 (Tr. 88: 4-9). In fact, Freemyer averred, he had "no knowledge of [the spreadsheet's] heritage prior to its coming to exist on February 4th on the laptop." *Id.* at 44 (Tr. 88:9-11).

### B.  Rule 26 Analysis

As a threshold matter, the Court must determine whether Freemyer is properly considered an expert witness for plaintiffs.

Defendant argues that Freemyer is properly classified as an expert witness because he testified as to "interpretations and opinions on certain metadata." ECF 73 at 4. Plaintiffs do not dispute that Freemyer is an expert witness.  *See* ECF 81; *see also*  ECF 85 at 2 ("Plaintiffs do not dispute" that they "would seek to elicit" testimony from Freemyer that constitutes "expert opinions. . . ."). But, they essentially argue that the joint designation of SullivanStrickler as a neutral expert and the production of reports through the FSP is the equivalent of the expert disclosure contemplated by Rule 26(a)(2). ECF  81 at 2-3.

As noted, plaintiffs elicited testimony from Freemyer concerning the interpretation of metadata attached to spreadsheets on Bero's computer. ECF 81-1 at 48 (Tr. at 92:17-21).  Courts routinely conclude that the interpretation and analysis of metadata requires an expert qualified in

the field. *See*, *e.g.*, *Highland Consulting Group v. Minjares Soule,* RLR-19-81636, 2021 WL 3793026, at *1 (S.D. Fla. Aug. 26, 2021) ("The Court agrees that metadata is a matter beyond the understanding of the average lay person and therefore an appropriate subject for expert testimony."); *Traverse v. Gutierrez Co.,* JCB-18-10175, 2020 WL 9601830, at *2 (D. Mass. June 26, 2020) ("Defendants have failed to heed this Court's concern that they had failed to provide expert testimony regarding under what circumstances the 'last modified' date in an Excel spreadsheet will change."); *State v. Payne*, 440 Md. 680, 691, 104 A.3d 142, 148 n.14 (2014) ("When metadata is presented in the course of litigation, it is accomplished through expert testimony.") (citing *United States v. Lanzon*, 639 F.3d 1293, 1297 (11th Cir. 2011)); *see also In re Tri Harbor Holdings Corp.,* 645 B.R. 690, 710 (Bankr. D.N.J. 2022) (precluding nonexpert from testifying as to metadata); *United States v. Wilkins,* REL-15-232, 2016 WL 2616497, at *4-5 (W.D. Mo. Apr. 8, 2016) (same); *Secure Energy Inc. v. Coal Synthetics,* JCH-8-1719, 2010 WL 597388, at *4 (E.D. Mo. Feb. 17, 2010) (same).

Thus, to the extent Freemyer's testimony involves the interpretation of metadata, or opinion testimony with regard to metadata, he is properly characterized as an expert witness. This implicates Fed. R. Civ. P. 26(a). "The purpose of Rule 26(a) is to allow litigants 'to adequately prepare their cases for trial and to avoid unfair surprise.'" *Bresler v. Wilmington Trust Co.*, 855 F.3d 178, 190 (4th Cir. 2017) (quoting *Russell v. Absolute Collection Servs., Inc.*, 763 F.3d 385, 396 (4th Cir. 2014)). And, "Rule 26 disclosures are often the centerpiece of discovery in litigation that uses expert witnesses." *Saudi v. Northrop Grumman Corp.*, 427 F.3d 271, 278 (4th Cir. 2005).

Rule 26(a)(2) provides:

   (2) *Disclosure of Expert Testimony.*

   (A) *In General.* In addition to the disclosures required by Rule 26(a)(1), a party
   must disclose to the other parties the identity of any witness it may use at trial to
   present evidence under Federal Rule of Evidence 702, 703, or 705.

(B) *Witnesses Who Must Provide a Written Report.* Unless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report—prepared and signed by the witness—if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony. The report must contain:

(i) a complete statement of all opinions the witness will express and the basis and reasons for them;

(ii) the facts or data considered by the witness in forming them;

(iii) any exhibits that will be used to summarize or support them;

(iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;

(v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and

(vi) a statement of the compensation to be paid for the study and testimony in the case.

(C) *Witnesses Who Do Not Provide a Written Report.* Unless otherwise stipulated or ordered by the court, if the witness is not required to provide a written report, this disclosure must state:

(i) the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705; and

(ii) a summary of the facts and opinions to which the witness is expected to testify.

(D) *Time to Disclose Expert Testimony.* A party must make these disclosures at the times and in the sequence that the court orders. Absent a stipulation or a court order, the disclosures must be made:

(i) at least 90 days before the date set for trial or for the case to be ready for trial; or

(ii) if the evidence is intended solely to contradict or rebut evidence on the same subject matter identified by another party under Rule 26(a)(2)(B) or (C), within 30 days after the other party's disclosure.

SullivanStrickler was jointly retained as an expert by both sides to undertake a neutral forensic analysis. However, there is nothing in the FSP indicating whether SullivanStrickler would be called to testify at trial. On December 2, 2022, defendant was informed that a representative of SullivanStrickler "has knowledge related to the processes and methods involved in administering

the Stipulated Forensic Search Protocol agreed to by the parties . . . ." ECF 81-2 at 3. This was well after plaintiffs' expert disclosure deadline of July 29, 2022. ECF 24 at 1. But, it was hardly news to Bero.

"The scope of the disclosure required under the Federal Rules of Civil Procedure depends on whether the person [is an] expert witness[] 'retained or specially employed to provide expert testimony' or whether the witness [is a] 'hybrid fact/expert witness[] pursuant to Fed. R. Civ. P. 26(a)(2)(A).'" *London v. Washington Metropolitan Area Transit Authority*, AAQ-21-1497, 2023 WL 3727058, at *3 (D. Md. May 30, 2023) (citing Local Rule 104.10); *see Fields v. Allstate Corp.*, CBD-11-653, 2012 WL 1792639, at *2 (D. Md. May 15, 2012). "Experts that are specially retained are governed by Rule 26(a)(2)(B), while hybrid witnesses such as treating physicians are governed by Rule 26(a)(2)(C)." *Ace American Insurance Co. v. McDonald's Corp.*, GLR-11-3150, 2012 WL 2523883, at *3 (D. Md. Jun. 28, 2012); *see Barnes v. Costco Wholesale Corp.*, JKB-18-3377, 2019 WL 3767506, at *2 (D. Md. Aug. 9, 2019) ("[The] testimony [of treating physicians] is subject to the summary disclosure requirements of Rule 26(a)(2)(C). . . .)

Rule 26(a)(2)(C) requires that a disclosure of a hybrid fact/expert witness "must state: (i) the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705; and (ii) a summary of the facts and opinions to which the witness is expected to testify." This information amounts to more than mere identification. *Mezu v. Morgan State Univ.*, 269 F.R.D. 565, 581 n.15 (D. Md. 2010). But, "[t]his disclosure is considerably less extensive than the report required by Rule 26(a)(2)(B)" and does not require "undue detail." Fed. R. Civ. P. 26(a)(2)(C) Advisory Committee's Note to 2010 Amendment. On the other hand, it requires more than "vague generalizations" as to the subject matter of the opinions of the witness. *Keralink, Int'l v. Stradis Healthcare, LLC*, CCB-18-2013, 2021 WL 1198150, at *2 (D. Md. Mar.

31

30, 2021) (quoting *Meredith v. Int'l Marine Underwriters*, JKB-10-837, 2011 WL 1466436, at *7 (D. Md. Apr. 18, 2011)).

Under the circumstances of this case, Freemyer has characteristics of both a fact witness and an expert witness. He is akin to the treating physician who operates on a plaintiff injured in a car accident. Indeed, Bero admits that "Mr. Freemyer's role as a 'neutral' arguably exempts him from the requirements of Rule 26(a)(2)(B), which requires experts 'retained or specially employed to provide expert testimony in the case' to prepare an expert report." ECF 85 at 3. Nevertheless, because Freemyer is a hybrid witness, his testimony is subject to Rule 26(a)(2)(C). Under that Rule, the plaintiffs must disclose (i) the subject matter on which he is expected to present evidence under Federal Rule of Evidence 702, 703, or 705; and (ii) a summary of the facts and opinions to which he is expected to testify. *See Donalds v. Ethicon, Inc.,* 22-1737, 2023 WL 2446703, at *5 (4th Cir. Mar. 10, 2023) (per curiam) (recognizing that Rule 26(a)(2)(c) applied to a doctor who was designated in his capacity as a treating physician, not a retained expert).

Because plaintiffs did not timely comply with Rule 26(a)(2)(C), Fed. R. Civ. P. 37 is implicated. Rule 37 "'gives teeth' to the Rule 26(a)(2) requirements by 'forbidding a party's use of improperly disclosed information at a trial, at a hearing, or on a motion, unless the party's failure to disclose is substantially justified or harmless.'" *Barnett v. United States*, DCN-20-2517, 2021 WL 5888542, at *2 (D.S.C. Dec. 13, 2021) (quoting *Tokai Corp. v. Easton Enters.*, 632 F.3d 1358, 1365 (Fed. Cir. 2011)).

## C. Rule 37 Analysis

Fed. R. Civ. P. 37(c)(1) provides, in relevant part: "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure

was substantially justified or is harmless." *See Bresler*, 855 F.3d at 190; *Southern States Rack and Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 596 (4th Cir. 2003).

"[T]he basic purpose of Rule 37(c)(1)" is "preventing surprise and prejudice to the opposing party." *Southern States*, 318 F.3d at 596.  The Fourth Circuit has emphasized that Rule 37(c)(1) imposes an "'automatic sanction' of exclusion," and that the "general rule" is that evidence a party has "failed to properly disclose" should be excluded.  *Id*. at 595 n.2, 596 (quoting 1993 Advisory Committee Note to Fed. R. Civ. P. 37). This is because "[a] party that fails to provide [Rule 26] disclosures unfairly inhibits its opponent's ability to properly prepare, unnecessarily prolongs litigation, and undermines the district court's management of the case." *Saudi*, 427 F.3d at 278-79.

"The only exceptions to exclusion [under Rule 37(c)(1)] are when the nondisclosure is substantially justified or harmless." *Contech Stormwater Solutions, Inc. v. Baysaver Technologies, Inc.*, 534 F. Supp. 2d 616, 623 (D. Md. 2008). "The party failing to disclose information bears the burden of establishing that the nondisclosure was substantially justified or was harmless." *Bresler*, 855 F.3d at 190.

"District courts are accorded 'broad discretion' in determining whether a party's nondisclosure or untimely disclosure of evidence is substantially justified or harmless." *Id*. (quoting *Wilkins v. Montgomery*, 751 F.3d 214, 222 (4th Cir. 2014)). "[I]n exercising its broad discretion to determine whether a nondisclosure of evidence is substantially justified or harmless for purposes of a Rule 37(c)(1) exclusion analysis, a district court should be guided by the following factors: (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would

disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence." *Southern States*, 318 F.3d at 597.

"The first four factors listed above relate primarily to the harmlessness exception, while the last factor, addressing the party's explanation for its nondisclosure, relates mainly to the substantial justification exception." *Bresler*, 855 F.3d at 190. But, a district court is "not *required* to tick through each of the *Southern States* factors." *Wilkins*, 751 F.3d at 222 (emphasis in original); *accord Hoyle v. Freightliner, LLC*, 650 F.3d 321, 330 (4th Cir. 2011). Moreover, "Rule 37(c)(1) does not require a finding of bad faith or callous disregard of the discovery rules." *Southern States*, 318 F.3d at 596.

Considering these principles and the case law, I readily conclude that exclusion of Freemyer's testimony is not warranted under Rule 37(c)(1).

To be sure, the requirements imposed by Rule 26(a)(2) are not complicated, and the Scheduling Order clearly established an expert disclosure deadline for plaintiffs of July 29, 2022. *See* ECF 24 at 1.  Yet, plaintiffs did not timely comply with Rule 26(a)(2)(c).  But, when plaintiffs disclosed the expert, he was not unknown to defendant. To the contrary, the parties jointly chose his firm in connection with the FSP and the preparation of the Forensic Report, and his role as the neutral expert was certainly well known to the defense.

Indeed, "[all] parties received the reports SullivanStrickler created in fulfillment of [its] work." ECF 81 at 2. And, the expert, as part of the FSP, was clearly required to provide "a list of items that were created, accessed, modified, or deleted . . . ." ECF 35 at 11. Thus, Bero cannot claim surprise. *See London,* 2023 WL 3727058, at *7 ("[T]he central purpose of Rule 37(c)(1) is to prevent last minute surprise to an opposing party.") (quoting *SAS Institute Inc. v. Akin Gump Strauss Hauer & Feld, LLP,* WAW-10-101, 2012 WL 12914641, at *4 (E.D.N.C. Dec. 11, 2012)).

Moreover, Freemyer was deposed before Bero filed his Cross Motion. *Cf. Hoyle*, 650 F.3d at 330 (concluding that the defendant "ha[d] clearly been prejudiced in that it has lost its opportunity to depose [the witness]"). And, after the formal disclosure, the defense never sought to reopen discovery or to name its own expert. It is also noteworthy that no trial date has been set. *See Doe v. AE Outfitters Retail Co.,* TJS-14-0508, 2015 WL 132609, at *4 (D. Md. Jan. 8, 2015).

The Court is mindful that expert testimony can often prove critical. Evidence as to the provenance of certain documents could be vital to the determination of whether Bero breached the Non-Disclosure Covenant in his Employment Agreement. *See Prusin v. Canton's Pearls, LLC,* SAG-16-605, 2017 WL 3492163, at *5 (D. Md. Aug. 15, 2017) (considering the importance of the evidence to the "ultimate determination of the case" when evaluating Rule 37(c) sanctions for Rule 26(a)(2) violation). Nevertheless, under the circumstances attendant here, the sanction of exclusion is not warranted. Therefore, I shall deny the Motion to Strike (ECF 73).

## IV.  Legal Principles Applicable to the Motion and Cross Motion

### A.  Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *see also Cybernet, LLC v. David*, 954 F.3d 162, 168 (4th Cir. 2020); *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018); *Iraq Middle Mkt. Dev. Found v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017). To avoid summary judgment, the nonmoving party must demonstrate that there is a genuine dispute of material fact that precludes the award of summary judgment as a matter of law. *Ricci v. DeStefano*, 557 U.S. 557, 585-86 (2009); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86

(1986); *Gordon v. CIGNA Corp.*, 890 F.3d 463, 470 (4th Cir. 2018).

The Supreme Court has clarified that not every factual dispute will defeat a summary judgment motion. "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248.

There is a genuine dispute as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see CTB, Inc. v. Hog Slat, Inc.*, 954 F.3d 647, 658 (4th Cir. 2020); *Variety Stores, Inc.*, 888 F.3d at 659; *Sharif v. United Airlines, Inc.*, 841 F.3d 199, 2014 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252; *see McAirlaids, Inc. v. Kimberly-Clark Corp.*, 756 F.3d 307, 310 (4th Cir. 2014). But, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Pursuant to Fed. R. Civ. P. 56(c)(1), where the moving party bears the burden of proof on the issue at trial, he must support his factual assertions by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials . . . ." But,

where the nonmovant bears the burden of proof at trial, the moving party may show that it is entitled to summary judgment by citing to evidence in the record, or "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325; *see also* Fed. R. Civ. P. 56(c)(1)(B).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004); *see Celotex Corp.*, 477 U.S. at 322-24. And, the court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party. *Ricci*, 557 U.S. at 585-86; *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *accord Knibbs v. Momphand*, 30 F.4th 200, 206 (4th Cir. 2022); *Walker v. Donahoe*, 3 F.4th 676, 682 (4th Cir. 2021); *Hannah P. v. Coats*, 916 F.3d 327, 336 (4th Cir. 2019); *Variety Stores, Inc.*, 888 F.3d at 659; *Gordon*, 890 F.3d at 470; *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017).

But, the nonmovant "must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015) (internal quotation marks omitted). Rather, "there must be evidence on which the jury could reasonably find for the nonmovant." *Thompson v. Virginia*, 878 F.3d 89, 97 (4th Cir. 2017) (alteration and internal quotation marks omitted).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *accord Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). Thus, in

considering a summary judgment motion, the court may not weigh the evidence or make credibility

determinations. *Brown v. Lott*, No. 21-6928, 2022 WL 2093849, at *1 (4th Cir. June 10, 2022) (per

curiam); *Knibbs*, 30 F.4th at 207, 213; *Betton v. Belue*, 942 F.3d 184, 190 (4th Cir. 2019); *Wilson*

*v. Prince George's Cnty.*, 893 F.3d 213, 218-19 (4th Cir. 2018); *Jacobs v. N.C. Administrative*

*Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499

F.3d 345, 352 (4th Cir. 2007). Therefore, in the face of conflicting evidence, such as competing

affidavits, summary judgment is not appropriate, because it is the function of the factfinder to

resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v.*

*United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*,

290 F.3d 639, 644-45 (4th Cir. 2002).

That said, "a party's 'self-serving opinion . . . cannot, absent objective corroboration, defeat

summary judgment.'" *CTB, Inc.*, 954 F.3d at 658-59 (quoting *Williams v. Giant Food Inc.*, 370

F.3d 423, 433 (4th Cir. 2004)). But, if testimony is based on personal knowledge or firsthand

experience, it can be evidence of disputed material facts, even if it is uncorroborated and self-

serving. *Lovett v. Cracker Barrel Old Country Store, Inc.*, 700 F. App'x 209, 212 (4th Cir. 2017).

Indeed, "'a great deal of perfectly admissible testimony fits'" the "'description'" of "'self-

serving.'" *Cowgill v. First Data Technologies, Inc.*, 41 F.4th 370, 383 (4th Cir. 2022) (citing

*United States v. Skelena*, 692 F.3d 725, 733 (7th Cir. 2012)).

On the other hand, "[u]nsupported speculation is not sufficient to defeat a summary

judgment motion." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987); *see*

*also Reddy v. Buttar*, 38 F.4th 393, 403-04 (4th Cir. 2022); *CTB, Inc.*, 954 F.3d at 659; *Harris v.*

*Home Sales Co.*, 499 F. App'x 285, 294 (4th Cir. 2012). "[T]o avoid summary judgment, the non-

moving party's evidence must be of sufficient quantity and quality as to establish a genuine issue

of material fact for trial. Fanciful inferences and bald speculations of the sort no rational trier of fact would draw or engage in at trial need not be drawn or engaged in at summary judgment." *Local Union 7107 v. Clinchfield Coal Co.*, 124 F.3d 639, 640 (4th Cir. 1997) (citations omitted). At the same time, if testimony from a nonmovant is based on personal knowledge or firsthand experience, it can be evidence of disputed material facts, even if it is uncorroborated and self-serving. *Lovett*, 700 F. App'x at 212.

"Where, as here, 'cross-motions for summary judgment are before a court, the court examines each motion separately, employing the familiar standard under Rule 56 of the Federal Rules of Civil Procedure.'" *Coalition for TJ v. Fairfax Cnty. Sch. Bd.*, 68 F.4th 864, 878 (4th Cir. 2023) (quoting *Fusaro v. Howard*, 19 F.4th 357, 366 (4th Cir. 2021)); *see also Aleman v. City of Charlotte*, __ F.4th __ , 2023 WL 5257679, at *14 (4th Cir. Aug. 16, 2023); *Belmora LLC v. Bayer Consumer Care*, 987 F.3d 284, 291 (4th Cir. 2021); *Defs. of Wildlife v. N.C. Dep't of Transp.*, 762 F.3d 374, 392 (4th Cir. 2014) (citation omitted). And, as noted, the court "'resolve[s] all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion.'" *Defs. of Wildlife*, 762 F.3d at 393 (quoting *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003), *cert. denied*, 540 U.S. 822 (2003)); *see Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003).

In sum, simply because opposing parties have moved for summary judgment does not mean that summary judgment for one side or the other is necessarily appropriate. Indeed, "[b]oth motions must be denied if the court finds that there is a genuine issue of material fact." 10A C. Wright, A. Miller, & M. Kane, Federal Practice & Procedure § 2720 (4th ed. Suppl. 2022) ("Wright & Miller").

### B.  Choice of Law

Both Allegis and Aston are Maryland corporations.  ECF 1, ¶¶ 4, 5. Bero is a citizen of Tennessee.  *Id.* ¶ 6. Therefore, jurisdiction is founded on diversity of citizenship.  *See* 28 U.S.C. § 1332(a)(1).  The parties assume that Maryland law applies, without discussion.

"When choosing the applicable state substantive law while exercising diversity or supplemental jurisdiction, a federal district court applies the choice of law rules of the forum state." *Ground Zero Museum Workshop v. Wilson*, 813 F. Supp. 2d 678, 696 (D. Md. 2011); *see Colgan Air, Inc. v. Raytheon Aircraft Co.*, 507 F.3d 270, 275 (4th Cir. 2007); *Baker v. Antwerpen Motorcars, Ltd.*, 807 F. Supp. 2d 386, 389 n.13 (D. Md. 2011). Maryland is, of course, the forum state.

As to contract claims, Maryland applies the law of the state where the contract was formed ("lex loci contractus"), unless the parties to the contract agreed to be bound by the law of another state. *See, e.g. Cunningham v. Feinberg*, 441 Md. 310, 326, 107 A.3d 1194, 1204 (2015); *Erie Ins. Exch. v. Heffernan*, 399 Md. 598, 618, 925 A.2d 636, 648 (2007); *Am. Motorists Ins. Co. v. ARTRA Group, Inc.*, 338 Md. 560, 573, 659 A.2d 1295, 1301 (1995); *TIG Ins. Co. v. Monongahela Power Co.*, 209 Md. App. 146, 161, 58 A.3d 497, 507 (2012), *aff'd*, 437 Md. 372, 86 A.3d 1245 (2014). "For choice-of-law purposes, a contract is made where the last act necessary to make the contract binding occurs." *Konover Prop. Tr., Inc. v. WHE Assocs.*, 142 Md. App. 476, 490, 790 A.2d 720, 728 (2002) (citing *Commercial Union Ins. Co. v. Porter Hayden Co.*, 116 Md. App. 605, 672, 698 A.2d 1167, 1200 (1997), *cert. denied*, 348 Md. 205, 703 A.2d 147 (1997)).

Count I, brought only by Aston, is predicated on defendant's alleged violation of the Employment Agreement.  The Employment Agreement specifies, ECF 1-1, ¶ 10: "This Agreement is being entered into in the State of Maryland and thus shall be governed by, construed, interpreted

40

and enforced in accordance with the laws of the State of Maryland, without giving effect to the principles of conflicts of laws thereof. . . ."  Counts II and III, lodged by both plaintiffs, are tied to defendant's alleged breach of the IGP. The IGP states, ECF 1-2, ¶ 11.11: "This Plan shall be governed and construed in accordance with the applicable laws of the State of Maryland."

Accordingly, I shall apply Maryland law with respect to the contract disputes in this case.

### C.  Principles of Contract Interpretation

All three counts concern disputes arising from two contracts: the Employment Agreement (ECF 1-1) and the IGP (ECF 1-2). As noted, Count I alleges breach of the Employment Agreement. Count II asserts breach of the IGP.  And, Count III seeks a declaratory judgment under 28 U.S.C. § 2201, to the effect that plaintiffs are not liable to Bero under the IGP for any monetary sums. Therefore, I shall review the principles of contract interpretation under Maryland law.

A contract is defined as "a promise or set of promises for breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty." RICHARD A. LORD, 1 WILLISTON ON CONTRACTS § 1:1 (4th ed. 1990) ("Williston on Contracts"); *accord* RESTATEMENT (SECOND) OF CONTRACTS § 1 (1981); *see also Maslow v. Vanguri*, 168 Md. App. 298, 321, 896 A.2d 408, 421-22, *cert. denied*, 393 Md. 478, 903 A.2d 416 (2006). "'A contract is formed when an unrevoked offer made by one person is accepted by another.'" *Cty. Comm'rs for Carroll Cty. v. Forty W. Builders, Inc.,* 178 Md. App. 328, 377, 941 A.2d 1181, 1209 (2008) (quoting *Prince George's Cty. v. Silverman*, 58 Md. App. 41, 57, 472 A.2d 104, 112 (1984)), *cert. denied*, 405 Md. 63, 949 A.2d 652 (2008).

A contract may be oral or written, as well as express or implied. "'An express contract has been defined as an actual agreement of the parties, the terms of which are openly uttered or declared at the time of making it, being stated in distinct and explicit language, either orally or in

writing.'" *Maryland Cas. Co. v. Blackstone Int'l Ltd.*, 442 Md. 685, 706, 114 A.3d 676, 688 (2015)

(quoting *Cnty. Comm'rs of Caroline Cnty v. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 94, 747

A.2d 600, 606 (2000)). Whether oral or written, a contract must express with certainty the nature

and extent of the parties' obligations and the essential terms of the agreement. *Forty W. Builders,*

*Inc.*, 178 Md. App. at 377-78, 941 A.2d at 1209-10; *see Canaras v. Lift Truck Services*, 272 Md.

337, 346, 322 A.2d 866, 871 (1974). If an agreement omits an important term, or is otherwise too

vague or indefinite with respect to an essential term, it is not enforceable. *Mogavero v. Silverstein*,

142 Md. App. 259, 272, 790 A.2d 43, 51 (2002); *see L & L Corp. v. Ammendale*, 248 Md. 380,

385, 236 A.2d 734, 737 (1967); *Schloss v. Davis*, 213 Md. 119, 123, 131 A.2d 287, 290 (1956)

(stating that a "contract may be so vague and uncertain as to price or amount as to be

unenforceable").

Mutual assent is an integral component of every contract. *See, e.g., Joseph Saveri Law*

*Firm Inc. v. Michael E. Criden, P.A.,* 759 F. App'x 170, 173 (4th Cir. 2019) (per curiam)

(recognizing as a "bedrock principle of law" that an offeree must accept an offer to form a

contract); *Cochran v. Norkunas*, 398 Md. 1, 14, 919 A.2d 700, 708 (2007); *Advance Telecom*

*Process LLC v. DSFederal, Inc.*, 224 Md. App. 164, 177, 119 A.3d 175, 183 (2015). In determining

whether there is an enforceable contract, courts in Maryland begin the analysis "by discussing the

essential prerequisite of mutual assent to the formation of a contract . . . ." *Falls Garden Condo.*

*Ass'n, Inc. v. Falls Homeowners Ass'n, Inc.*, 441 Md. 290, 302, 107 A.3d 1183, 1189 (2015); *see*

*also Mitchell v. AARP*, 140 Md. App. 102, 116, 779 A.2d 1061, 1069 (2001) ("An essential element

with respect to the formation of a contract is 'a manifestation of agreement or mutual assent by the

parties to the terms thereof; in other words, to establish a contract the minds of the parties must be

in agreement as to its terms.'" (citations omitted)). "Manifestation of mutual assent includes two

issues: (1) intent to be bound, and (2) definiteness of terms." *Cochran*, 398 Md. at 14, 919 A.2d at 708.

Ordinarily, a contract is not enforceable unless it is supported by consideration. *Harford Cty. v. Town of Bel Air*, 348 Md. 363, 381, 704 A.2d 421, 430 (1998). "In Maryland, consideration may be established by showing 'a benefit to the promisor or a detriment to the promise.'" *Forty W. Builders, Inc.*, 178 Md. App. at 384-85, 941 A.2d at 1213 (citations and some internal quotation marks omitted). "A promise becomes consideration for another promise only when it constitutes a binding obligation. Without a binding obligation, sufficient consideration does not exist to support a legally enforceable agreement." *Cheek v. United Healthcare of Mid-Atl., Inc.*, 378 Md. 139, 148, 835 A.2d 656, 661 (2003).

"[A] breach of contract is generally defined as a 'failure, without legal excuse, to perform any promise that forms the whole or part of a contract.'" *Weaver v. ZeniMax Media, Inc.*, 175 Md. App. 16, 51, 923 A.2d 1032, 1052 (2007) (citing Williston on Contracts § 63:1. Therefore, the elements of a claim for breach of contract are "'contractual obligation, breach, and damages.'" *Tucker v. Specialized Loan Servicing, LLC*, 83 F. Supp. 3d 635, 655 (D. Md. 2015) (quoting *Kumar v. Dhanda*, 198 Md. App. 337, 17 A.3d 744, 749 (2011)); *see also RRC Ne., LLC v. BAA Md., Inc.*, 413 Md. 638, 658, 994 A.2d 430, 442 (2010) (noting the elements of contractual obligation and breach); *Belyakov v. Med. Sci. & Computing*, 86 F. Supp. 3d 430, 437 (D. Md. 2015) (same). But, "[i]t is not necessary that the plaintiff prove damages from the breach, for it is well settled that where a breach of contract occurs, one may recover nominal damages even though he has failed to prove actual damages." *Taylor v. NationsBank, N.A.*, 365 Md. 166, 175, 776 A.2d 645, 651 (2001).

Case 1:22-cv-00686-ELH   Document 93   Filed 09/14/23   Page 44 of 88

Further, in Maryland "a plaintiff alleging a breach of contract 'must of necessity allege with certainty and definiteness facts showing'" the existence, and the breach, of a contractual obligation. *Polek v. J.P. Morgan Chase Bank, N.A.*, 424 Md. 333, 362, 36 A.3d 399, 416 (2012) (emphasis in original) (citation omitted). The agreement between the parties "ultimately determines" whether a breach occurred. *Mathis v. Hargrove*, 166 Md. App. 286, 318-19, 888 A.2d 377, 396 (2005). And, "a person cannot be held liable under a contract to which he was not a party." *Residential Warranty Corp. v. Bancroft Homes Greenspring Valley, Inc*., 126 Md. App. 294, 316, 728 A.2d 783, 794 (1999); *see Weems v. Nanticoke Homes, Inc*., 37 Md. App. 544, 551-57, 378 A.2d 190, 194-97 (1977).

Under Maryland law, the interpretation of a contract is "ordinarily a question of law for the court." *Grimes v. Gouldmann*, 232 Md. App. 230, 235, 157 A.3d 331, 335 (2017); *see also Spacesaver Sys., Inc. v. Adam*, 440 Md. 1, 7, 98 A.3d 264, 268 (2014); *Myers v. Kayhoe*, 391 Md. 188, 198, 892 A.2d 520, 526 (2006); *Towson Univ. v. Conte*, 384 Md. 68, 78, 862 A.2d 941, 946 (2004); *Sy-Lene of Washington, Inc. v. Starwood Urban Retail II, LLC*, 376 Md. 157, 163, 829 A.2d 540, 544 (2003); *Lema v. Bank of Am., N.A.*, 375 Md. 625, 641, 826 A.2d 504, 513 (2003); *Under Armour, Inc. v. Ziger/Snead, LLP*, 232 Md. App. 548, 552, 158 A.3d 1134, 1136 (2017). "'The cardinal rule of contract interpretation is to give effect to the parties' intentions.'" *Dumbarton Imp. Ass'n. Inc. v. Druid Ridge Cemetery Co.*, 434 Md. 37, 51, 73 A.3d 224, 232 (2013) (citation omitted). To determine the parties' intention, courts look first to the written language of the contract. *Walton v. Mariner Health of Maryland, Inc.*, 391 Md. 643, 660, 894 A.2d 584, 594 (2006) ("Generally, when seeking to interpret the meaning of a contract our search is limited to the four corners of the agreement.").

44

"Maryland courts interpreting written contracts have long abided by the law of objective contract interpretation, which specifies that 'clear and unambiguous language' in an agreement 'will not give way to what the parties thought the agreement meant or was intended to mean.'" *Urban Growth Prop. Ltd. P'ship v. One W. Balt. St. Assocs. LLC*, No. 882, Sept. Term, 2015, 2017 WL 526559, at *5 (Md. Ct. Spec. App. Feb. 9, 2017) (citation omitted) (unpublished); *see Cochran*, 398 Md. at 16, 919 A.2d at 709; *W.F. Gebhardt & Co., Inc. v. American European Ins. Co.*, 250 Md. App. 652, 666, 252 A.3d 65, 73 (2021); *Huggins v. Huggins & Harrison, Inc.*, 220 Md. App. 405, 417, 103 A.3d 1133, 1139 (2014). In other words, a court will presume that the parties meant what they stated in an unambiguous contract, without regard to what the parties to the contract subjectively intended or personally thought it meant. *See Martz v. Day Development Co., L.C.*, 35 F.4th 220, 225 (4th Cir. 2022); *Dumbarton*, 434 Md. at 51, 73 A.3d at 232; *Dennis v. Fire & Police Employees' Ret. Sys.*, 390 Md. 639, 656, 890 A.2d 737, 747 (2006); *PaineWebber Inc. v. East*, 363 Md. 408, 414, 768 A.2d 1029, 1032 (2001); *see also, e.g., Hartford Acc. & Indem. Co. v. Scarlett Harbor Assoc. Ltd. P'ship*, 109 Md. App. 217, 291, 674 A.2d 106, 142 (1996) ("Where the language of a contract is clear, there is no room for construction; it must be presumed that the parties meant what they expressed."), *aff'd*, 346 Md. 122, 695 A.2d 153 (1997).

A court's "task, therefore, when interpreting a contract, is not to discern the actual mindset of the parties at the time of the agreement." *Dumbarton*, 434 Md. at 52, 73 A.3d at 232. Rather, the court is to "'determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated.'" *Id.* (quoting *Gen. Motors Acceptance v. Daniels*, 303 Md. 254, 261, 492 A.2d 1306, 1310 (1985)); *see Cochran*, 398 Md. 1, 919 A.2d at 710 ("Under the objective theory of contracts, [courts] look at what a reasonably prudent person in the same position would have understood as to the meaning of the

45

agreement."); *Scarlett Harbor*, 109 Md. App. at 291, 674 A.2d at 142 ("[T]he court must, as its first step, determine from the language of the agreement what a reasonable person in the position of the parties would have meant at the time the agreement was effectuated.").

In other words, "the plain meaning is determined by 'focus[ing] on the four corners of the agreement.'" *Martz*, 35 F.4th at 225 (citation omitted) (alteration in *Martz*). "'The words employed in the contract are to be given their ordinary and usual meaning, in light of the context within which they are employed.'" *DIRECTV, Inc. v. Mattingly*, 376 Md. 302, 313, 829 A.2d 626, 632-33 (2003) (citations omitted). But, Maryland courts also turn to the dictionary "'to supply contractual language with its ordinary and accepted meanings . . . .'" *W.F. Gebhardt & Co., Inc.*, 250 Md. App. at 668, 252 A.3d at 74 (quoting *Credible Behavioral Health, Inc. v. Johnson*, 466 Md. 380, 394, 220 A.3d 303, 311 (2019)).

A contract is ambiguous "'if, to a reasonable person, the language used is susceptible of more than one meaning or is of doubtful meaning.'" *Martz*, 35 F.4th at 225 (citation omitted); *see also Cochran*, 398 Md. at 17, 919 A.2d at 710; *Sy-Lene of Washington*, 376 Md. at 167, 829 A.2d at 547; *Auction & Estate Representatives, Inc. v. Ashton*, 354 Md. 333, 340, 731 A.2d 441, 444-45 (1999); *Calomiris v. Woods*, 353 Md. 425, 436, 727 A.2d 358, 363 (1999). But, a contract is not ambiguous merely because the parties do not agree on its meaning. *Fultz v. Shaffer*, 111 Md. App. 278, 299, 681 A.2d 568, 578 (1996). "Furthermore, 'simply because [a party] can point to several slightly different dictionary definitions of [a word] does not render that term ambiguous.'" *W.F. Gebhardt & Co., Inc.*, 250 Md. App. at 652, 252 A.3d at 74 (quoting *Rigby v. Allstate Indem.*, 225 Md. App. 98, 110, 123 A.3d 592, 598-99 (2015)) (alterations in *W.F. Gebhardt & Co., Inc.*).

To ascertain whether a contract is ambiguous, a court considers "the character of the contract, its purpose, and the facts and circumstances of the parties at the time" that they enter into

the contract.  *Pacific Indem. Co. v. Interstate Fire & Cas. Co.*, 302 Md. 383, 388, 488 A.2d 486, 488 (1985).  Generally, "'ambiguities are resolved against the draftsman of the instrument.'"  *John L. Mattingly Const. Co., Inc. v. Hartford Underwriters Ins. Co.*, 415 Md. 313, 334, 999 A.2d 1066, 1078 (2010).  But, "'[i]f only one reasonable meaning can be ascribed to the [contract] when viewed in context, that meaning necessarily reflects the parties' intent.'"  *Forty W. Builders, Inc.*, 178 Md. App. at 377, 941 A.2d at 1209 (quoting *Labor Ready, Inc. v. Abis*, 137 Md. App. 116, 128, 767 A.2d 936, 942 (2001)).

Consideration of extrinsic evidence is unnecessary when a contract is unambiguous. *DIRECTV*, 376 Md. at 312, 829 A.2d at 630 (citations omitted); *see Clendenin Bros. v. U.S. Fire Ins. Co.*, 390 Md. 449, 459, 889 A.2d 387, 393 (2006).  Conversely, if the contract is ambiguous, "'the court must consider any extrinsic evidence which sheds light on the intentions of the parties at the time of the execution of the contract.'"  *Cty. Commissioners of Charles Cty. v. St. Charles Associates Ltd. P'ship*, 366 Md. 426, 445, 784 A.2d 545, 556 (2001) (citation omitted); *accord John L. Mattingly Const. Co.*, 415 Md. at 327, 999 A.2d at 1074; *see Point's Reach Condo. Council of Unit Owners v. Point Homeowners Ass'n, Inc.*, 321 Md. 152, 582 A.2d 493, 495 (1990).  For example, if a contract is ambiguous, "'extrinsic evidence may be consulted to determine . . . whether the ambiguous language has a trade usage.'"  *Mut. Fire Ins. Co. of Calvert Cty. v. Ackerman*, 162 Md. App. 1, 15, 872 A.2d 110, 118 (2005) (quoting *Pac. Indem. Co. v. Interstate Fire & Cas. Co.*, 302 Md. 383, 404, 488 A.2d 486, 497 (1985)); *see Della Ratta, Inc. v. Am. Better Cmty. Developers, Inc.*, 38 Md. App. 119, 130, 380 A.2d 627, 635 (1977).  But, extrinsic evidence may "not be used to contradict other, unambiguous language."  *Calomiris*, 353 Md. at 441, 727 A.2d at 366.

If a court determines that a contract is ambiguous, "'it may yet examine evidence extrinsic to the contract that is included in the summary judgment materials, and, if the evidence is, as a matter of law, dispositive of the interpretative issue, grant summary judgment on that basis.'" *Washington Metro. Area Transit Auth. v. Potomac Inv. Properties, Inc*., 476 F.3d 231, 235 (4th Cir. 2007) (quoting *Goodman v. Resolution Trust Corp*., 7 F.3d 1123, 1126 (4th Cir. 1993)). Nevertheless, if "'resort to extrinsic evidence in the summary judgment materials leaves genuine issues of fact respecting the contract's proper interpretation, summary judgment must of course be refused and interpretation left to the trier of fact.'" *Washington Metro. Area Transit Auth*., 476 F.3d at 235 (quoting *Goodman*, 7 F.3d at 1126); *see Sheridan v. Nationwide Ret. Sols., Inc*., 313 Fed. App'x 615, 619 (4th Cir. 2009). Put another way, the court may construe an ambiguous contract only "'if there is no factual dispute in the evidence.'"  *CB Structures, Inc. v. Potomac Electric Power Co.*, 122 F. Supp. 3d 247, 251 (D. Md. 2015) (citation omitted); *see also Chorley Entrs. v. Dickey's Barbecue Restaurants, Inc.*, 807 F.3d 553, 563 (4th Cir. 2015); *Pac. Indem. Co.*, 302 Md. at 389, 488 A.2d at 489.

"It is a fundamental principle of contract law that it is 'improper for the court to rewrite the terms of a contract, or draw a new contract for the parties, when the terms thereof are clear and unambiguous, simply to avoid hardships.'" *Calomiris*, 353 Md. at 445, 727 A.2d at 368 (quoting *Canaras*, 272 Md. at 350, 322 A.2d at 873); *see Loudin Ins. Agency, Inc. v. Aetna Cas. & Sur. Co.*, 966 F.2d 1443 (Table), 1992 WL 145269, at *5 (per curiam) ("[A] court will not rewrite the parties' contract simply because one party is no longer satisfied with the bargain he struck."). Therefore, a court may not "add or delete words to achieve a meaning not otherwise evident from a fair reading of the language used." *Brensel v. Winchester Constr. Co.*, 392 Md. 601, 624, 898 A.2d 472, 485 (2006).

The Employment Agreement here is "at will." ECF 1-1 at 4, ¶ 2.  In Maryland, an employment contract of indefinite duration, *i.e.*, at will, may be terminated by either party, at any time, for any reason, so long as it is not for an illegal reason. *Adler v. American Standard Corp.*, 291 Md. 31, 35 432 A.2d 464, 467 (1981); *see Molesworth v. Brandon*, 341 Md. 621, 628, 672 A.2d 608, 612 (1996).

### D. Restrictive Covenants Generally

The enforceability of a restrictive covenant in a contract depends "on the scope of each particular covenant itself" and, if it is "not too broad on its face, the facts and circumstances of each case must [also] be examined." *Becker v. Bailey*, 268 Md. 93, 97, 299 A.2d 835, 838 (1973); *accord Millward v. Gerstung Int's Sport Educ., Inc*., 268 Md. 483, 488, 302 A.2d 14, 16 (1973).

Under Maryland law, there are four requirements that must be met to enforce a restrictive covenant. *Medispec, Ltd. v. Chouinard*, 133 F. Supp. 3d 771, 773-74 (D. Md. 2015) (citing *Deutsche Post Global Mail, Ltd. v. Conrad*, 116 F. App'x 435, 438 (4th Cir. 2004) (per curiam)), *aff'd on other grounds*, 116 F. App'x 435 (4th Cir. 2004). They are, *Medispec*, 133 F. Supp. 3d at 773-74:

> (1)  the employer must have a legally protected interest, (2) the restrictive covenant must be no wider in scope and duration than is reasonably necessary to protect the employer's interest, (3) the covenant cannot impose an undue hardship on the employee, and (4) the covenant cannot violate public policy.

*See also Paul v. ImpactOffice LLC*, TDC-16-2686, 2017 WL 2462492, at *4 (D. Md. June 6, 2017), *appeal dismissed sub nom. ImpactOffice LLC v. Siniavsky*, 17-1634, 2017 WL 6543801 (4th Cir. Dec. 1, 2017); *Holloway v. Faw, Casson & Co*., 319 Md. 324, 334, 572 A.2d 510, 515 (1990); *Silver v. Goldberg*er, 231 Md. 1, 6, 188 A.2d 155, 158 (1963).

Generally, "restrictive covenants may be applied and enforced only against those employees who provide unique services, or to prevent the future misuse of trade secrets, routes or

lists of clients, or solicitation of customers." *Becker*, 268 Md. at 97, 299 A.2d at 838 (discussing *Tuttle v. Riggs-Warfield-Roloson*, 251 Md. 45, 246 A.2d 588 (1968); *Ruhl v. F. A. Bartlett Tree Expert C*o., 245 Md. 118, 225 A.2d 288 (1967); *Western Md. Dairy v. Chenowith*, 180 Md. 236, 23 A.2d 660 (1942); *Tolman Laundry v. Walker*, 171 Md. 7, 187 A. 836 (1936)); *see also Ecology Servs., Inc. v. Clym Envtl. Servs., LLC*, 181 Md. App. 1, 15, 952 A.2d 999, 1007 (2008); *Fowler v. Printers II, Inc.,* 89 Md. App. 448, 459, 598 A.2d 794, 799 (1991), *cert. denied*, 325 Md. 619, 602 A.2d 710 (1992). However, the restrictions must be reasonable. *See Ruhl*, 245 Md. at 123, 225 A.2d at 291 (finding that restrictive covenants are enforceable where they are "confined within limits which are no wider as to area and duration than are reasonably necessary for the protection of the business of the employer").

Of relevance here, in determining whether an employer has a legally protected interest, Maryland courts consider whether "goodwill" was generated by one party for the benefit of the other party. *See Seneca One Finance, Inc. v. Bloshuk*, 214 F. Supp. 3d 457, 464 (D. Md. 2016) ("[T]he interest protectable by a non-compete provision is the goodwill that the *employee* creates with the customer while working for the employer.") (emphasis in original); *see also Deutsche Post*, 116 F. App'x at 438; *Tolman Laundry*, 171 Md. at 7, 187 A. at 838. The Maryland Court of Appeals[14] said in *Silver*, 231 Md. at 7, 188 A.2d at 158 (emphasis in original):

---

[14] In the general election held in November 2022, the voters of Maryland approved a constitutional amendment to change the name of the Maryland Court of Appeals to the Supreme Court of Maryland. And, the voters approved changing the name of the State's intermediate appellate court, the Maryland Court of Special Appeals, to the Appellate Court of Maryland. These changes went into effect on December 14, 2022. *See* Press Release, Maryland Courts, Voter-approved constitutional change renames high courts to Supreme and Appellate Court of Maryland (Dec. 14, 2022), https://www.courts.state.md.us/media/news/2022/pr20221214#:~:text=Effective%20immediately %2C%20the% 20Court% 20of,the%20Appellate% 20Court% 20of% 20Maryland.

> *[R]estraint is justified* if a part of the compensated services of the former employee consisted in the creation of the good will of customers and clients which is likely to follow the person of the former employee . . . *restraint is not justified* if the harm caused by service to another consists merely in the fact that the former employee becomes a more efficient competitor.

*Accord Holloway*, 319 Md. at 335, 572 A.2d at 515; *Fowler*, 89 Md. App. at 459, 598 A.2d at 799.

Protecting goodwill "guards against the risk that the customer will be loyal to the employee with whom he has a relationship, rather than the relatively impersonal employer." *Seneca One*, 214 F. Supp. 3d 457, 465 (D. Md. 2016); *see also Holloway*, 319 Md. at 335, 572 A.2d at 515; *Silver*, 231 Md. at 6, 188 A.2d at 158. Typically, the degree to which a former employee is responsible for the contacts between the customer and the employer is pertinent to the existence of goodwill. Thus, "[t]here is a distinction" to be drawn

> between the cases where business success is attributable to the quality of the product being sold, and those where the personal contact of the employee with the customer is an important factor. In the latter case, the employer has a stronger need for protection against diversion of his business to the former employee who has had personal contacts with customers which the employer lacks.

*Millward*, 268 Md. at 488-89, 302 A.2d at 17 (internal quotation marks and citation omitted; alteration added).

As to duration, "Maryland has consistently upheld two year limitations on employment with competitors as reasonable." *PADCO Advisors, Inc. v. Omdahl*, 179 F. Supp. 2d 600, 606 (D. Md. 2002). Geographic scope must also be reasonable. *See Ruhl*, 245 Md. at 123, 225 A.2d at 291. Generally, the validity of the radius depends on the facts of the case. But, judges of this Court have observed that even a fifty-mile radius may be reasonable. *See, e.g., Aerotek, Inc., v. Obercian,* 377 F. Supp. 3d 539, 547 n.5 (D. Md. 2019); *TEKsystems, Inc. v. Bolton*, RDB-08-3099, 2010 WL 447782, at *5 (D. Md. Feb. 4, 2010). Further, in *Ruhl*, 245 Md. at 128-29, 225 A.2d at 293, the

---

To avoid confusion, I will refer to the names of the courts as they existed when the cited cases were decided.

Maryland Court of Appeals upheld the geographical restriction prohibiting the defendants from working for a competing business in five Maryland Eastern Shore counties and an adjoining Delaware county, because that was the area in which the employee had worked for the company. And, the absence of a geographic limitation for a noncompete clause has also been upheld, generally when the employer competes on a national level, if the restriction is reasonable based on the facts. *See, e.g., Intelus Corp. v. Barton*, 7 F. Supp. 2d 635, 641 (D. Md. 1998).

If a court finds that a restrictive covenant is overbroad, it may nevertheless preserve and enforce the covenant by excising, or "blue penciling," unreasonable language. *Deutsche Post Glob. Mail, Ltd.*, 116 F. App'x at 439 (citation omitted); *see Ameritox, Ltd. v. Savelich*, 92 F. Supp. 3d 389, 400 (D. Md. 2015); *Fowler*, 89 Md. App. at 465-66, 598 A.2d at 802. However, "[a] court can only blue pencil a restrictive covenant if the offending provision is neatly severable." *Deutsche Post Glob. Mail, Ltd*., 116 F. App'x at 439.

So, "[i]f two provisions of a noncompete are distinct, divisible promises, a court may excise the offending provision." *Aerotek, Inc*., 377 F. Supp. 3d at 548. Conversely, "a court may not excise 'the dominant language or words' from a covenant that is part of a 'single indivisible promise.'" *Paul*, 2017 WL 2462492, at *8 (citation omitted). Neither may a court "'rearrange or supplement the language of the restrictive covenant.'" *Cytimmune Sci., Inc. v. Paciotti*, PWG-16-1010, 2016 WL 4699417, at *4 (D. Md. Sept. 8, 2016) (quoting *Deutsche Post Glob. Mail, Ltd*., 116 F. App'x at 439).

### E.  Declaratory Judgment

In Count III, plaintiffs seek a declaratory judgment to the effect that they have no monetary liability to Bero under the IGP.  The Declaratory Judgment Act, 28 U.S.C. § 2201(a), provides:

> In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

In order to bring a declaratory judgment action under 28 U.S.C. § 2201, the plaintiff must establish the existence of a dispute that is "'definite and concrete, touching the legal relations of parties having adverse legal interests'; and that [is] 'real and substantial.'"  *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (citation omitted).  This is necessary to satisfy the case or controversy requirement of Article III of the Constitution.  *Id.* at 126-27.

The Declaratory Judgment Act "is remedial only and neither extends federal courts' jurisdiction nor creates any substantive rights."  *CGM, LLC v. BellSouth Telcoms., Inc.*, 664 F.3d 46, 55 (4th Cir. 2011) (citing *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671-72 (1950)); *see also Profiles, Inc. v. Bank of America Corp.*, 453 F. Supp. 3d 742, 752 (D. Md. 2020) ("The Declaratory Judgment Act 'provides a remedy in cases otherwise in the Court's jurisdiction; it does not create an independent cause of action.'") (quoting *Elec. Motor and Contracting Co., Inc. v. Travelers Indemnity Co. of Am.*, 235 F. Supp. 3d 781, 793 (E.D. Va. 2017)). Consequently, "'[a] request for declaratory relief is barred to the same extent that the claim for substantive relief on which it is based would be barred.'" *CGM, LLC*, 664 F.3d at 55-56 (alteration in original) (citation omitted).

Further, the statute's "permissive language has long been interpreted to provide discretionary authority to district courts to hear declaratory judgment cases."  *United Capitol Ins. Co. v. Kapiloff*, 155 F.3d 488, 493 (4th Cir. 1998).  Thus, the Declaratory Judgment Act "'merely permits' federal courts to hear those cases rather than granting litigants a right to judgment."

*Medical Mutual Ins. Co. of N.C. v. Littaua*, 35 F.4th 205, 208 (4th Cir. 2022) (quoting *Trustgard Ins. Co. v. Collins*, 942 F.3d 195, 201-02 (4th Cir. 2019)).

## V.  Discussion

### A.  Count I (Breach of Employment Agreement)

Both Aston and Bero have moved for summary judgment as to Count I of the Amended Complaint, which asserts multiple claims of breach of the Employment Agreement. ECF 65-1 at 17-21; ECF 70-1 at 20-25.  In particular, Aston alleges that Bero violated the Non-Solicitation Covenant in paragraph 4; the Non-Disclosure Covenant in paragraph 6; and the Return and Preservation of Records provision in paragraph 7. ECF 50-1 at 13-14, ¶¶ 51-56; *see* ECF 1-1 at 5-10, ¶¶ 4, 6, 7.  Bero disagrees.  ECF 70; ECF 70-1.

### 1.  Non-Solicitation Covenant

Aston contends that Bero violated the Non-Solicitation Covenant set forth in paragraph 4 of the Employment Agreement. ECF 1-1 at 5-7, ¶ 4.  The provision, which is lengthy, provides, in relevant part, *id.* at 5-6:

> **NON-SOLICITATION COVENANT:**   EMPLOYEE agrees that upon the termination of EMPLOYEE's employment, whether by COMPANY or EMPLOYEE and whether with or without cause, for the Restricted Period EMPLOYEE shall not directly or indirectly:
>
> (a) Communicate with any individual or entity which is a Covered Customer for the purpose of:
>
> > (i) entering into any business relationship with such Covered Customer if the business relationship is competitive with any aspect of COMPANY's Business (or any COMPANY affiliate which employed EMPLOYEE during the Look Back Period) for which EMPLOYEE performed services or about which EMPLOYEE obtained Confidential Information during the Look Back Period, or
> >
> > (ii) reducing or eliminating the business such customer conducts with COMPANY (or any COMPANY affiliate which employed EMPLOYEE during the Look Back Period) . . . .

"Covered Customer" is defined as follows, *id.* at 7:

> "Covered Customer" means an COMPANY [sic] customer (person or entity) that EMPLOYEE had business-related contact with or obtained Confidential Information about during the Look Back Period, and, where enforceable under applicable law, a Covered Customer shall also include those persons or entities with whom COMPANY had a reasonable expectation of doing business based on pending requests for proposal, open bids or similar communications in form and substance in which EMPLOYEE was involved occurring during the Look Back Period . . . .

The "Look Back Period" is referenced in paragraph 4, but it is defined in paragraph 3, titled "Non-Compete Covenant." The term "Look Back Period" is defined as "the two (2) year period preceding termination of EMPLOYEE's employment." ECF 1-1 at 5, ¶ 3. The same provision defines the "Restricted Period" as "a period of eighteen (18) months . . . " following employment. *Id.* Moreover, the "Restricted Area" is defined as "a radius of fifty (50) miles from the office in which EMPLOYEE worked at the time EMPLOYEE's employment terminated . . . ." *Id.*[15] The term "involved" is not defined.

The parties disagree about whether the Non-Solicitation Covenant is enforceable in whole, in part, or not at all, and whether, if it is partially or wholly enforceable, there is a genuine dispute of material fact as to whether Bero breached it. *See* ECF 65-1 at 22-26; ECF 70-1 at 17-25; ECF 78 at 2-10; ECF 84 at 18-20. In particular, Aston claims that the provision is valid and that Bero breached the provision. Bero contends that the provision is not valid and, in any event, that he did not breach it.

I turn first to the parties' contentions concerning the enforceability of the Non-Solicitation Covenant.

---

[15] In the IGP, the provision barring "Competitive Activity" by a former employee applies "within a radius of two hundred fifty (250) miles of the office in which" the employee last worked. ECF 1-2 at 5-6, ¶ 2.16.

Aston asserts that it "has legally-protected interests in preventing Bero from using its confidential information or customer relationships to bring new business to Jobot." ECF 65-1 at 22. And, Aston argues that the "scope" of the Non-Solicitation Covenant "is no broader than reasonably necessary to protect [its] business and goodwill." *Id.* According to Aston, the provision applies only to customers "that Bero had business-related contact with during the final two years of his employment" and "customers about which Bero gained confidential information during the final two years of his employment." *Id.* at 23. Moreover, Aston maintains that, because of Bero's "leadership role," he had access to confidential information that "extended far beyond that of his own customers." *Id.* at 24. Therefore, according to Aston, the customer confidential information "category" is reasonable. *Id.*

In the Cross Motion, Bero asserts that the definition of "Covered Customer" in the Non-Solicitation Covenant is overbroad insofar as it includes prospective customers and customers about whom Bero merely acquired Confidential Information, but with whom he did not actually have business-related contact. ECF 70-1 at 19-20. And, he contends that the definition of "Confidential Information" is broader than what is protected under the Maryland Uniform Trade Secrets Act ("MUTSA"), Md. Code (2013 Repl. Vol., 2022 Supp.), § 11-1201 *et seq.* of the Commercial Law Article ("C.L."). *See* ECF 70-1 at 26.[16]

In reply, Aston argues that the Non-Solicitation Covenant is facially enforceable because it is narrowly tailored to cover only customers that Bero "personally had contact with or obtained confidential information about—not *all* customers—within those aspects of the business in which he worked during the final two years of his employment with Aston Carter and its affiliates." ECF

---

[16] Although Bero presents this contention in his argument concerning the enforceability of the Non-Disclosure Covenant, it applies with equal force to the Non-Solicitation Covenant, because the definition of "Confidential Information" in both provisions is the same.

78 at 6 (emphasis in original). But, in the event that the Court finds that the Non-Solicitation Covenant is too broad, Aston urges the Court to use the blue-pencil method to strike the unreasonable portion. *Id*. at 7. In particular, Aston asserts that "[t]he 'or obtained Confidential Information about' language Bero complains of—if it were too broad—is 'neatly severable' and therefore appropriate for blue-penciling . . . ." *Id.*

I begin my assessment of the Non-Solicitation Covenant's reasonableness by considering its duration and geographic reach. As mentioned, its prospective duration is eighteen months. ECF 1-1 at 5-6, ¶¶ 3,4. During that eighteen-month period, Bero was restricted from soliciting customers with whom he did business or about whom he acquired confidential information during the "Look Back Period," that is, the final two years of his employment at Aston.  *Id.* Maryland courts generally find a post-termination restriction period of two years to be reasonable. *See, e.g., PADCO Advisors, Inc*., 179 F. Supp. 2d at 606. Therefore, the eighteen-month duration of the Non-Solicitation Covenant passes muster.

As to the geographic area, the Non-Solicitation Covenant states, ECF 1-1 at 7, ¶ 4: "Where required by applicable law, the restrictions in Paragraph 4 shall be limited to the Restricted Area." And, the "Restricted Area" is defined in Paragraph 3 of the Employment Agreement as "within a radius of fifty (50) miles from the office in which EMPLOYEE worked at the time EMPLOYEE's employment terminated or any other office in which EMPLOYEE worked during the Look Back Period." *Id.* at 5, ¶ 3.  With good reason, Bero does not challenge the geographic restriction.

As mentioned, Bero complains that the class of customers he is barred from soliciting is unreasonably large, because the definition of "Covered Customer" includes prospective customers about whom he merely had "Confidential Information."  ECF 70-1 at 20.  In his view, this "expands" the restriction to include those with whom he had no business contact. *Id.*  As indicated,

Bero also challenges the scope of the definition of Confidential Information. *Id.* at 26.  He complains that the definition of "Covered Customer" includes potential customers with whom Bero "did not necessarily communicate . . . ."  *Id.* at 20.

The Employment Agreement provides "that the restrictions in this Agreement (including post-employment restrictions) are reasonable and necessary to preserve COMPANY's legitimate and protectable business interests in, among other things, its trade secrets, Confidential Information, and goodwill with customers and employees, and they do not unduly interfere with EMPLOYEE's ability to earn a livelihood." ECF 1-1 at 4, ¶ 1.  The enforceability of a restrictive covenant turns on whether it is narrowly tailored to the employer's protectable interest. *See Medispec*, 133 F. Supp. 3d at 773-74.  A "restrictive covenant will be construed as overly broad if it goes beyond what is needed to safeguard the employer's legally protected interest in that goodwill." *Allied Fire Protection, Inc. v. Thai*, PWG-17-551, 2017 WL 4354802, at *5 (D. Md. Oct. 2, 2017) (citation omitted).

Bero does not contest that Aston does, indeed, have a legitimate interest in customer goodwill.  However, he maintains that the Non-Solicitation Covenant extends beyond that which is reasonably necessary to protect Aston's interest.[17]

The case of *Gill v. Computer Equip. Corp.,* 266 Md. 170, 292 A.2d 54 (1972), is informative. In *Gill*, a restrictive covenant prevented Gill, a former employee, from working for customers of his former employer, but only customers of the particular division in which Gill had worked. *Id*. at 181, 292 A.2d at 59. Gill argued that the covenant was "unduly restrictive because it contain[ed] no limitation as to [geographic] area." *Id*. at 180, 292 A.2d at 59. In upholding the

---

[17] Aston points out that Bero never asserted "undue hardship" when suit was filed, and waited nearly eleven months to do so.  ECF 65-1 at 24 n.10.  Given Aston's belated filing of a claim based on the Non-Solicitation Covenant, Aston's argument is a curious one.

covenant, the Maryland Court of Appeals said, *id*.: "The scope of the limitation . . . basically is to customers of [the former employer] in the narrow area in which [the former employee] was employed." In other words, the "prohibition was limited to a specific, identifiable class." *Hebb v. Stump, Harvey & Cook, Inc*., 25 Md. 478, 489, 334 A.2d 563, 570 (1975) (construing *Gill*, 266 Md. 170, 292 A.2d 54).

*Medispec,* 133 F. Supp. 3d 771, also provides guidance. In that case, the court concluded that a covenant not to compete was "overly broad and not reasonably targeted to achieve Plaintiff's stated interest in protecting its goodwill." *Id.* at 775. It reached that conclusion because the covenant barred the former employer "from taking any job, no matter how unrelated to his prior sales work." *Id.; see also RLM Communications, Inc. v. Tuschen*, 831 F.3d 190, 196 (4th Cir. 2016) (construing North Carolina law and concluding that restriction of the employee's future employment was "unmoored" from employer's legitimate business interests).

The case of *Seneca One*, 214 F. Supp. 3d 457, is also instructive. There, the employer, Seneca One, sued a former employee for breach of a restrictive covenant that barred the employee from soliciting any of Seneca One's customers, including those "with whom [she] dealt or had direct contact," and those "about whom, even without direct contact, [she] received Confidential Information." *Id*. at 464 (internal citation omitted). The non-solicitation provision broadly defined "Customers" to include "potential customers" as well as "all individuals, firms, or entities that . . . have been in contact with Seneca One." *Id*.

The employee moved to dismiss, arguing that the restrictive covenant was overbroad. *Id*. at 459. The district court granted the motion. In its view, the restrictive covenant's definition of "Customer," coupled with the ban on "soliciting business even from individuals with whom [the employee] had no direct contact (thus eliminating any concerns regarding potential competitive

advantage)," rendered the provision facially overbroad. *Id*. at 464. The court reasoned that it was "not possible" for an employee with "no contact or communication with the potential customers" to generate "goodwill" with the customers. *Id*. at 465.

*Bindagraphics, Inc. v. Fox Group, Inc*., 377 F. Supp. 3d 565 (D. Md. 2019), is illuminating. It involved a customer non-solicitation provision and a noncompete provision included in an employment agreement between a salesman, Eric Rodgers, and his former employer, Bindagraphics, Inc. The non-solicitation provision declared "that, for one year following his termination, Mr. Rodgers will not directly or indirectly solicit any customer or prospective customer for products or services the same as, or similar to, those sold by Bindagraphics's trade binding division." *Id*. at 574. Additionally, the covenant barred Rodgers "from selling, or being otherwise involved in the sale of, any such product or service to customers or prospective customers during that year." *Id*. The restriction pertained to customers "within Mr. Rodgers's sales territory who were either served by Bindagraphics in the year preceding Mr. Rodgers's departure or with whom Mr. Rodgers spoke within one year of them being a Bindagraphics customer." *Id*. And, "prospective customers" were defined as any customer who was "solicited by Mr. Rodgers or Bindagraphics in the year preceding Mr. Rodgers's termination." *Id*.

Judge Blake found that the provision was overbroad and thus unenforceable. *Id*. at 575. She reasoned, *id*. at 574-75 (internal citations omitted) (emphasis added):

> The nonsolicitation clause at issue here is broader in scope than reasonably necessary because it applies to prospective customers and the passive sale or provision of services to a customer that Mr. Rodgers did not solicit. First, the covenant's restriction on solicitation of prospective customers, those within the sales territory solicited by Bindagraphics in the year preceding Mr. Rodgers's departure, *is not narrowly drawn to cover only those with whom Mr. Rodgers had contact*. Instead, while Mr. Rodgers may have contacted some prospective customers in his capacity with Bindagraphics, the prohibition includes all potential customers solicited by the Bindagraphics trade binding division, drawing a wide prohibition well beyond Mr. Rodgers's personal connections. . . . Limiting contact

with prospective customers is sufficiently untethered from the protected goodwill concern to render this provision overbroad.

Additionally, Judge Blake observed that the covenant purported "to limit Mr. Rodgers's ability to sell 'or otherwise service' any Bindagraphics trade binding division customer." *Id*. at 575. Accordingly, the provision "extende[d] to unsolicited bids from customers who initiate contact with Mr. Rodgers, his work on projects solicited or arranged by other employees, and work on behalf of customers who patronize both competitors." *Id*. Thus, she determined that "the risk this provision seeks to forestall is a risk of greater competition," which is not a protected interest. *Id*. (citing *Deutsche Post Global Mail, Ltd*., 116 F. App'x at 438).

Moreover, Judge Blake observed that "it is possible that the facially overbroad components of the nonsolicitation covenant are sufficiently separate (and severable) as to be blue-penciled. But . . . [Bindagraphics did] not put forth a particular proposal for how the provision might be blue-penciled to pertain only to customers with whom Mr. Rodgers interacted." *Bindagraphics*, 377 F. Supp. 3d at 575. Notably, Judge Blake said that "the court prefers not to decide whether the nonsolicitation promise can be narrowed, and if so, whether it is reasonably necessary both facially and as-applied to Bindagraphic's protected interest.[l]" *Id.*  Therefore, she dismissed the non-solicitation claim, without prejudice. *Id.* at 576.

The case of *Paul*, 2017 WL 2462492, is also informative. The plaintiff there was a former employee of an office supply company. *Id.* at *1.  He sought a declaratory judgment concerning the enforceability of a non-solicitation provision and a noncompete provision contained within his employment agreement. *Id.* at *1-2.  The non-solicitation provision, in relevant part, prohibited the employee from "[s]olicit[ing] or accept[ing], directly or indirectly, the business of any customer or prospective customer . . . ." *Id.* at *5.  Judge Chuang determined that the clause was overbroad and unenforceable. *Id.* at *6.

61

In particular, the district court found overbroad the bar on solicitation of the former employer's "prospective customers," because it included "those with whom the former employee may have had no personal contact . . . ." *Id.* The court noted that the term "prospective customer" would "encompass virtually any company with a need to purchase" the employer's product, even if that company had never previously interacted with the employer. *Id.*

As to "prospective" customers, the court noted that they "would not have been the subject of customer goodwill generated by a former [employee]." *Id.* Thus, "the bar on accepting business" would be "reasonably tailored" when the former employee has "interacted" with a customer or has "knowledge of [a customer's] prior dealings with [the employer]." *Id.*

Both sides cite this Court's opinion in *Waypoint Mgmt. Consulting, LLC v. Krone*, ELH-19-2988, 2022 WL 2528465 (D. Md. July 6, 2022). *See* ECF 65-1 at 29; ECH 70-1 at 26; ECF 78 at 10-11; ECF 84 at 15. In *Krone*, I found that the noncompete covenant at issue in that case did not suffer from the defects of the non-solicitation provisions evaluated in *Bindagraphics* and *Paul*. *Krone*, 2022 WL 2528465, at *36-37. I explained that, "[u]nlike the restrictive covenants in those cases, the Noncompete Covenant [in *Krone*] is 'limited to a specific, identifiable class,'" namely those customers with whom the defendant had had personal contact. *Id.* at *37 (quoting *Hebb*, 25 Md. At 489, 334 A.2d at 570) (alterations added).

Here, the Non-Solicitation Covenant restricts communications with a "Covered Customer," which includes "an COMPANY customer [sic] . . . that EMPLOYEE had business-related contact with or obtained Confidential Information about during the Look Back Period," and prospective clients, that is, "persons or entities with whom Aston had a reasonable expectation of doing business based on pending requests for proposal, open bids or similar communications in

form and substance in which EMPLOYEE was involved occurring during the Look Back Period." ECF 1-1 at 7, ¶ 4.

Therefore, the Non-Solicitation Covenant includes customers with whom Bero had no business contact, but about whom he supposedly had access to "Confidential Information." The definition of Confidential Information, however, is far broader than what is covered by MUTSA, as discussed *infra*.

Moreover, the Non-Solicitation Covenant extends to *prospective* customers if Aston had "a reasonable expectation of doing business" with them and the employee "was involved" in the pursuit of this new business during the Look Back Period. *Id.* The clause references an expectation of business based on "pending requests for proposal, open bids or similar communications in form and substance . . ." in which the employee was involved. *Id.* But, it is not clear how an employee would be able to determine if a communication is similar "in form and substance." Nor does it make clear what kind of involvement would trigger application of the clause, because the term "involved" is not defined. To that extent, no notice is provided to the employee of the conduct that is subject to the clause.[18]

To illustrate the vagueness of the undefined term "involved," a ministerial task such as photocopying a proposal could be regarded as being "involved" in the pursuit of a prospective customer. However, such conduct surely would not warrant restriction. *See Fairfield Six/Hidden Valley P'ship v. Resolution Trust Corp.,* 860 F.Supp. 1085, 1089 (D. Md. 1994) ("Although Maryland courts do not favor the destruction of contracts due to uncertainty, they will not enforce

---

[18] Resort to the dictionary would be of no help. *See Involved*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/involved (last updated Aug. 22, 2023) (defining "involved" as "having a part in something: included in something").

a contract if it is so vague that the court cannot discern the intention of the parties from it.")
(citations omitted).

In addition, courts generally find that non-solicitation provisions are unreasonable to the
extent that they bar employees from soliciting prospective customers, as opposed to actual
customers. *See Aerotek, Inc.*, 377 F. Supp. 3d at 551 (concluding that a non-solicitation agreement
was enforceable to the extent that it applied to former employer's actual, rather than prospective,
customers). This provision suffers from that infirmity.  And, the restriction is flawed because it
prevents Bero from soliciting customers for which he generated no goodwill while working for
Aston, and for which no goodwill on Aston's part has been established.

In sum, I conclude that the restriction is not "narrowly tailored to the work that [Bero]
performed before termination." *See Allegis Group, Inc. v. Jordan*, GLR-12-2535, 2014 WL
2612604, at *8 (D. Md. Jun. 10, 2014). And, for that reason it is unenforceable, as written.

However, Aston asks the Court to sever the Non-Solicitation Covenant's unreasonable
provisions and enforce the remainder. ECF 78 at 6-7.  In particular, Aston asserts that "[t]he 'or
obtained Confidential Information about' language Bero complains of—if it is too broad—is
'neatly severable' and therefore appropriate for blue-penciling" if the Non-Solicitation Covenant
is unenforceable as written. *Id.* at 7 (citing *Jordan*, 2014 WL 2612604, at *9). In my view, this
proposed severance would not save the Non-Solicitation Covenant.

In particular, the Non-Solicitation Covenant is unreasonable insofar as it extends to
customers about whom Bero acquired Confidential Information, but with whom he had no personal
contact, *and* insofar as it extends to Aston's prospective customers with whom Bero may have
been "involved" during the Look Back Period. Therefore, to save the Non-Solicitation Covenant,
I would need to strike not only the "or obtained Confidential Information about" language, but

64

also that portion of the "Covered Customer" definition prohibiting Bero from soliciting prospective customers of Aston. This would result in the deletion of more than two-thirds of the definition of "Covered Customers."

I decline to salvage the provision with such an extensive modification. Therefore, I decline to enforce the Non-Solicitation Covenant against Bero.

However, even if I were to strike all of the unreasonable language from the definition of "Covered Customer," my assessment of the record suggests that Bero would still be entitled to summary judgment with respect to Aston's claim for breach of the Non-Solicitation Covenant.

With the unreasonable language stricken, the definition of "Covered Customer" would read: "'Covered Customer' means an COMPANY [sic] customer (person or entity) that EMPLOYEE had business-related contact with . . . during the Look Back Period." *See* ECF 1-1 at 7, ¶ 4. Aston does not specify the precise provision or provisions of the nearly two-page Non-Solicitation Covenant that Bero allegedly breached. But, Aston claims that Bero breached the Non-Solicitation Covenant based on two interactions, one with ETAP and another with Dave, Inc. *See* ECF 65-1 at 36-37; *see also* ECF 78 at 7 ("Bero breached his obligations not to solicit covered customers, specifically including Dave, Inc. and ETAP.").

In particular, Aston asserts that Bero breached the Non-Solicitation Covenant when he "initiated a business-related call with" Alfonso Vides at Dave, Inc., a customer with whom Bero worked while at Aerotek during the Look Back Period. ECF 65-1 at 26. And, Aston contends that Bero's alleged correspondence with Schneider Electric's subsidiary, ETAP, about a software engineer requisition, violated the Non-Solicitation Covenant because Bero was "working to close a multi-requisition deal [with Schneider Electric] in his final weeks of employment with Aston Carter." *Id.* at 25; ECF 78 at 9-10.

Bero observes in response that the Non-Solicitation Covenant prohibits communications intended to create a business relationship with a Covered Customer only if the relationship would be "competitive with an[] aspect of" Aston's business for which Bero "performed services" or for which he "obtained Confidential Information." ECF 70-1 at 22 (quoting ECF 1-1 at 6, ¶ 4). According to Bero, his correspondence with ETAP did not breach the Non-Solicitation Covenant because it concerned a "'Software Engineer and/or Developer'" requisition, which would have been outside the scope of his work while at Aston and Aerotek. *Id.* at 24. Bero also asserts that "there is no evidence that ETAP, as opposed to Schneider Electric, [was] a Covered Customer,"[19] because "ETAP [was] not listed on the customer list on which Aston Carter relies." *Id.* And, he argues that his communication with Dave, Inc. did not breach the Employment Agreement because it did not concern a business area in which Bero performed services while at Aston. *Id.* Moreover, he claims that Dave, Inc. was not one of Aston's Covered Customers. *Id.* at 23-24.

In reply, Aston asserts that the "Services Agreement" entered into by ETAP and Aston in January 2022 establishes that ETAP is, indeed, a Covered Customer. ECF 78 at 8. And, Aston argues that Bero's claim that he attempted to fill an ETAP requisition that was not within the scope of Aston's business is a red herring, because filling such a requisition would nonetheless constitute prohibited competitive activity. *Id.* at 9-10. And, with respect to Bero's communications with Dave, Inc., Aston avers that Bero's outreach to "Dave, Inc. was aimed at developing business." *Id.* at 9. Moreover, Aston argues that Dave, Inc. is a Covered Customer, because the Employment Agreement contains protections for Aston affiliates, and Bero worked with Dave, Inc. while

---

[19] To recall, the definition of "Covered Customer," with the unreasonable portions stricken, would be: "'Covered Customer' means an COMPANY [sic] customer (person or entity) that EMPLOYEE had business-related contact with . . . during the Look Back Period."

employed at Aerotek. *Id.* at 7-8. Aston points to the following provision in the Employment Agreement governing affiliate protection, ECF 1-1 at 13, ¶ 15:

> . . . COMPANY [*i.e.*, Aston] and its parent, subsidiaries, Affiliates, and divisions that EMPLOYEE provides services to or is provided Confidential Information about are all intended beneficiaries of this Agreement, including TEKsystems, Aston Carter, Allegis Global Solutions, and EASi, and shall be treated the same as COMPANY for purposes of all of the protections provided for in this Agreement . . .

The parties do not dispute that Bero's work at Aston was "limited to . . . three verticals": "Customer support; operations and administrative; and accounting and finance." ECF 71-3 at 15 (Tr. at 47-48).  Indeed, in the Motion, Aston characterizes Bero's previous job responsibilities this way: "While at Aerotek, Bero recruited candidates for administration, human resources, accounts receivable, and billing positions. His recruiting efforts at Aston Carter focused on accounting, finance, and professional services roles." ECF 65-1 at 13 (citations omitted).

As for Bero's interactions with ETAP, the record, when interpreted in the light most favorable to Aston, shows that Bero had business-related contact with that company while he was employed at Aston. *See* ECF 67-6; ECF 67-7. In addition, the record shows that on or around February 22, 2022, Bero discussed "Software openings" with Freddie Brouse of Schneider Electric, ETAP's parent company, and offered to "send over resumes for the Software Engineer and/or Developer for ETAP." ECF 65-2 at 49-51. Brouse replied that ETAP "would consider calling out a Technical Sales Engineer position, after [it] has more clarity on the cost structure." *Id.* at 49. Bero then wrote:  "I totally understand. I'll get that info based on the skill sets we would work on and get it back to you tomorrow morning." *Id.* Bero asserts that, because he considered the "sales engineer [requisition] . . . too similar to something [he did] for Aerotek," he did not "get back" to Brouse. ECF 70-4 at 61 (Tr. at 235:19-236:21). Plaintiffs have not pointed to any evidence

in the record that contradicts the assertion. For that reason, the record does not show that Bero solicited ETAP for any business other than the software engineer requisition.

Moreover, I am of the view that, when the facts are interpreted in the light most favorable to Aston, the record shows that ETAP was, in fact, was a Covered Customer. ECF 67-6.

However, if the software engineer requisition Bero discussed with ETAP was outside the parameters of Bero's work at Aston, it would be beyond the scope of the Non-Solicitation Covenant. ECF 84 at 19.  And, Aston does not dispute the assertion that Bero's work at Aston did not involve any software engineer requisitions. ECF 65-1 at 13 (stating that Bero's "recruiting efforts at Aston Carter focused on accounting, finance, and professional services roles."); ECF 78 at 9-10. Instead, as noted, Aston asserts that "[t]he fact that one particular requisition that Bero discussed with ETAP was for a software engineer position is a red-herring," because "Bero was seeking to establish a business relationship between ETAP and Jobot that unquestionably would have been competitive with Aston Carter had he succeeded." ECF 78 at 9-10.

Under the Non-Solicitation Covenant, however, it is not enough that Jobot's relationship with ETAP "would have been competitive with Aston Carter." To fall within the Non-Solicitation Covenant's ambit, the relationship must have been "competitive with any aspect of [Aston Carter's] business . . . for which EMPLOYEE performed services." *See* ECF 1-1 at 6, ¶ 4(a)(i). Therefore, even if I were to blue-pencil the Non-Solicitation Covenant and enforce it, there is no genuine dispute that Bero's interactions with ETAP while he was a Jobot employee did not relate to the business areas for which he performed services while an employee of Aston. As a result, his interactions with ETAP did not violate the Non-Solicitation Covenant.

I note that Aston's proposed construction of the Non-Solicitation Covenant to proscribe *all* business relationships "competitive with Aston Carter," ECF 78 at 10, regardless of the business

areas these relationships concern, would simply confirm the Non-Solicitation Covenant's overbreadth. Accordingly, even if I were to adopt Aston's construction of the Non-Solicitation Covenant, I would conclude that the Non-Solicitation Covenant is too broad.

Aston also argues that Bero breached the Non-Solicitation Covenant by soliciting business from Dave, Inc. ECF 65-1 at 26; ECF 78 at 7. The record, when interpreted in the light most favorable to Aston, shows that Bero "placed a candidate with [Dave, Inc.] from 4/25/2020 until 6/6/2020," that is, while he was an employee at Aston. ECF 65-1; ECF 67-2 at 2; ECF 67 at 103-104. And, when interpreted in the light most favorable to Aston, the record also shows that Dave, Inc. was a "Covered Customer." *See* ECF 70-4 at 64 (Tr. at 247). Moreover, the record reflects that in late February 2022, after Bero joined Jobot, he and Alfonso Vides at Dave, Inc. discussed a data scientist requisition. *See* ECF 65-2 at 52; ECF 70-4 at 62 (Tr. at 240). Again, however, the parties do not dispute that Bero's work at Aston was "limited to . . . three verticals": "Customer support; operations and administrative; and accounting and finance." ECF 71-3 at 15 (Tr. at 47-48); *see also* ECF 65-1 at 13 (citations omitted).

It follows that a data scientist requisition like the one Bero discussed with Vides was outside the scope of Bero's work at Aston. Therefore, even if I were to enforce a blue-penciled version of the Non-Solicitation Covenant, there is no genuine dispute that Bero's interactions with Vides while he was a Jobot employee did not relate to the business areas Bero serviced while at Aston. As a result, Bero's interactions with Dave, Inc. regarding a data scientist requisition did not violate the Non-Solicitation Covenant.

Finally, Aston asserts that "Bero competed against Aston Carter within the geographic territory rendered off-limits by the IGP," by seeking "to fill a Senior Accountant position in Alpharetta, Georgia, which is within 250 miles of his Aston Carter office." ECF 65-1 at 19. This

assertion does not implicate the Non-Solicitation Covenant, however, because the "Restricted Area" subject to the Non-Solicitation Covenant extends 50 miles from Aston's office in Franklin, Tennessee. *See* ECF 1-1 at 7, ¶ 4. Aston alleges that Alpharetta, Georgia is 238 miles from Aston's office in Franklin. ECF 65-1 at 19; ECF 65-7 at 2.

In sum, I conclude that the Non-Solicitation Covenant is unreasonable and unenforceable, and I decline to blue-pencil it.  But, alternatively, even if I were to make the excisions needed to save the provision, there is no genuine dispute that Bero's interactions with ETAP and Dave, Inc. while at Jobot did not relate to the business areas he served while at Aston.  Therefore, Bero's conduct did not fall within the ambit of the Non-Solicitation Covenant.

Accordingly, to the extent that Count I is based on the Non-Solicitation Covenant, I shall deny the Motion and grant the Cross Motion.

### 2. Non-Disclosure Covenant

Count I is also predicated on Bero's purported breach of Paragraph 6, titled "Covenant Not To Divulge Confidential Information." Pursuant to the Employment Agreement, Bero acknowledged the "highly competitive" nature of the professional staffing business. ECF 1-1 at 2. Bero also acknowledged that he would "become intimately involved with and knowledgeable of COMPANY's Confidential Information." *Id.* Moreover, the Employment Agreement states that Bero would be provided Confidential Information to "use in the performance" of his work, and that "disclosure to . . . third party persons or organizations . . . of the Confidential Information" would severely damage the employer. *Id.*  And, paragraph 6 provides that "EMPLOYEE shall not use, disclose or divulge any Confidential Information of COMPANY (or any COMPANY affiliate which employed EMPLOYEE during the Look Back Period) to any other person or entity besides COMPANY."  *Id.* at 8.

"Confidential Information" is also defined in Paragraph 6.  It states, in part, *id.* at 8:

. . . For purposes of this Agreement, "Confidential Information" shall mean information not generally known by the competitors of COMPANY or the general public concerning COMPANY's Business that COMPANY takes reasonable measures to keep secret, including but not limited to: financial information and financial controls; sales and marketing strategies; acquisition plans; pricing and costs; customers' names, addresses, e-mail addresses, telephone numbers, and contact persons; customers' staffing requirements; margin tolerances regarding pricing; the names, e-mail addresses, addresses, telephones numbers, skill sets, availability and wage rates of Contract Employees; sales, recruiting, pricing and marketing techniques; sales and recruiting manuals; forms and processes for acquiring and recording information; management analysis of salaries based on market competitiveness, employee compensation, and performance evaluations of Regular Employees; and management practices, procedures and processes. These restrictions on use or disclosure of Confidential Information will only apply for two (2) years after the end of EMPLOYEE's employment where information that does not qualify as a trade secret is concerned. The restrictions will apply to trade secret information for as long as the information remains qualified as a trade secret .

The Non-Disclosure Covenant prohibits Bero from "disclosing or divulging . . . Confidential Information . . . to any other person or entity. . . ." *Id.* ¶ 6.  Aston argues that Bero violated the provision when he emailed a "new book of biz" spreadsheet containing Confidential Information from his Aston email account to his personal Gmail account, and then "[o]n his first day at Jobot . . . forwarded from his personal email to his Jobot email a 'BoB' spreadsheet containing client information extracted from the 'new book of biz' spreadsheet diverted from Aston Carter." ECF 65-1 at 30. Further, plaintiff contends that the confidentiality provision is reasonable and enforceable. *Id.* at 26.  Among other things, plaintiff points to Bero's role as a "Divisional Practice Lead," *id.* at 27, which "put him in frequent and direct contact with Aston Carter's clients," *id.* at 28; *see also id.* at 13, ¶ 21; *id.* at 14, ¶¶ 22-23.

Bero counters that the "confidentiality provision here—which includes trade secrets and non-trade secrets (without defining either) as well as vague and broad terms such as 'sales, recruiting, pricing and marketing techniques,' 'forms and processes for acquiring and recording information,' and 'sales and marketing strategies'" is unenforceable because of its breadth and

vagueness. ECF 70-1 at 27.   Moreover, he maintains that sending himself an email does not constitute a violation of the provision, because he did not send emails to another person or entity. *Id.* at 27-29. And, he "denies using any Aston Carter or Aerotek document to create the 'BoB' spreadsheet, or otherwise using any of the documents he sent himself."  *Id.* at 30.

In support of his contention that the Non-Disclosure Covenant is unenforceable, Bero cites several cases in the District of Maryland in which judges found a confidentiality provision unenforceable to the extent that it protected information beyond that protected under the Maryland Uniform Trade Secrets Act, C.L. § 11-1201 *et seq*. ECF 70-1 at 25-27.  In reply, Aston asserts that the provision is enforceable because it "defines confidential information in detail, and it provides various specific examples of information that do and do not meet the definition." ECF 78 at 11.

As indicated, "'restrictive covenants may be applied' to protect against 'the future misuse of trade secrets, routes or lists of clients, or solicitation of customers.'" *Ameritox*, 92 F. Supp. 3d at 401 (quoting *Becker*, 268 Md. at 97, 299 A.2d at 838 (1973)). But, "'questions arise as to the enforceability of the Confidentiality Provisions by virtue of their having wider breadth than the [MUTSA].'" *Ameritox,* 92 F. Supp. 3d at 401 (quoting *Structural Pres. Sys., LLC v. Andrews*, MJG-12-1850, 2013 WL 3820023, at *4 (D. Md. Jul. 23, 2013)).

MUTSA defines "'Trade secret'" as "information, including a formula, pattern, compilation, program, device, method, technique, or process, that . . . (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." C.L. § 11-1201(e).

The definition of Confidential Information in the Non-Disclosure Covenant is far broader in scope than the definition of "trade secret" in MUTSA. Indeed, the Confidential Information provision clearly pertains to information that does not fit Maryland's statutory definition of trade secrets. In addition, under paragraph 6, information can be deemed confidential merely because the company takes "reasonable measures" to protect it. ECF 1-1 at 8, ¶ 6. But, there is no indication as to how an employee would know whether the Company has taken such measures.

Plaintiff's restrictions on use of trade secrets apply in perpetuity. But, as to confidential information that does not qualify as a trade secret, the restriction applies only for two years. However, the clause does not specify which category applies to the laundry list of items subject to the clause. As a result, an employee lacks "firm, solid guidance on what he can and cannot do if he leaves his employer," because it is unclear what information in the clause is a trade secret and what information is subject to use after the two-year restricted period. *See SNS One, Inc. v. Hage*, BEL-10-1592, 2011 WL 2746713, at *2 (D. Md. Jul. 11, 2011).

Aston suggests that the Court may exercise its authority to blue-pencil the provision if it is otherwise unenforceable. ECF 78 at 10-11. But, Aston has not offered the Court any proposal to salvage the provision.

In my view, the Non-Disclosure Covenant is overbroad. And, I decline to apply the blue-pencil doctrine to the terms of the Non-Disclosure Covenant in order to salvage it. The covenant's deficiency does not arise from specific offending terms that might easily be excised. Rather, the overbreadth of the Non-Disclosure Covenant arises from its failure to clearly define and distinguish the kinds of information encompassed by the terms "trade secret" and "Confidential Information." ECF 1-1 at 8-9, ¶ 6. To remedy such an error, the Court would be forced to rewrite the Non-Disclosure Covenant. *See Medispec, Ltd.*, 133 F. Supp. 3d at 775 n.3 ("Because no

independent sentence or clause could be excised here to narrow sufficiently the scope, blue penciling is inappropriate.").

Because I decline to enforce the Non-Disclosure Covenant, I need not resolve the parties' disagreement about whether Bero's emails from his Aston account to his Gmail account constituted an impermissible disclosure.

Therefore, to the extent that Count I is predicated on Aston's assertion that Bero violated the Non-Disclosure Covenant with respect to Confidential Information, I shall deny the Motion and I shall grant the Cross Motion.

### 3. Return and Preservation of Records

Aston alleges that Bero violated the provision concerning Return and Preservation of Records in Paragraph 7 of his Employment Agreement. Notably, the provision does not state a specific duration for which an employee must *preserve* "Company Records." It provides as follows, ECF 1-1 at 9-10, ¶ 7:

> EMPLOYEE agrees, upon termination of EMPLOYEE's employment with COMPANY for any reason whatsoever or sooner if requested, to return to COMPANY all records and other property (whether on paper, computer discs or in any other form and including, but not limited to, Confidential Information), and copies thereof, belonging or pertaining to COMPANY (collectively "Company Records"), subject to Paragraph 16. EMPLOYEE further agrees not to engage in any unauthorized destruction or deletion of Company Records during employment or upon termination of employment, including, without limitation, the deletion of electronic files, data, records or e-mails.  EMPLOYEE agrees that all compilations of information possessed or acquired by COMPANY, or created or maintained by EMPLOYEE in the course of employment for COMPANY, such as business-related contact lists, prospect lists, and forms shall be the property of COMPANY and shall be treated as Company Records irrespective of whether they qualify as Confidential Information or not.  EMPLOYEE acknowledges that EMPLOYEE's authorization to access COMPANY computer systems is limited and that access or use of such systems to compete or to prepare to compete is unauthorized and strictly prohibited. EMPLOYEE will take such steps requested by COMPANY to inspect and confirm that Company Records have been removed or deleted from all storage places, equipment, devices or accounts in EMPLOYEE's control . . . .

Aston argues that when Bero forwarded documents from his work email to his personal email, and subsequently failed to return them, he violated the Return and Preservation of Records provision. ECF 65-1 at 31-32.  According to Aston, Bero's failure to return the forwarded emails was not a mere technical breach, because the provision's purpose is to inform Aston of documents that are outside of the company's control, and to prevent a former employee from using company records to solicit Aston's customers. *Id.* at 32.

Bero first argues that, as a practical matter, it is impossible to "return" an email and an email attachment. ECF 70-1 at 33. Instead, only a copy of the files could possibly be returned. *Id.*

Bero also contends that, by focusing solely on his alleged failure to return digital files, Aston ignores the two-fold nature of the clause*, i.e.,* it is a return *and preservation* clause. *Id.* (emphasis in ECF 70-1).  He explains that the examples used in the contract to illustrate the return obligation are tangible items of property, *e.g.,* paper and computer disks. *Id.* In contrast, Bero highlights the digital nature of the examples used in the preservation provision, *e.g.,* electronic files and emails. *Id.* In turn, Bero suggests that the preservation provision applies to the emails and email attachments at issue, and that his only obligation with respect to these items was to withhold deletion and to work with Aston to ensure their deletion. *Id.* at 34.  And, Bero avers that his compliance with the FSP is evidence of his compliance with this provision. *Id.*; *see also* ECF 84 at 11-13.

In response, Aston suggests that, as a matter of common sense, for Bero to comply with the return provision he should have copied the items and returned them to a company representative. ECF 78 at 13.  Aston also cites *Ameritox*, 92 F. Supp. 3d 389, and *Cheryl & Co. v. Krueger*, 536 F. Supp. 3d 182 (S.D. Ohio 2021), for the proposition that forwarded emails can be "returned." ECF 78 at 14.

In my view, *Ameritox* does not support the proposition for which it is cited by Aston. In *Ameritox, Ltd.*, 92 F. Supp. 3d 389, an employer sued a former employee for breach of contract, misappropriation of trade secrets, and breach of the duty of loyalty. *Id.* at 394.  The plaintiff alleged that the employee violated a confidentiality and noncompete agreement when he sent confidential business information from his work email to his personal email. *Id.* at 393. At the outset of the litigation, "Ameritox moved for a TRO and preliminary injunction barring [the defendant] from, among other things, soliciting or attempting to solicit Ameritox customers or employees, or using or disclosing Ameritox's documents, information, or data." *Id.* at 394 (citation omitted).

The court granted the TRO, the terms of which are described in an Order not cited by Aston. *See Ameritox, Ltd. v. Savelich*, WDQ-15-499, 2015 WL 13609789 (D. Md. Feb. 25, 2015). This Order directed the defendant to return *copies* of the electronic information at issue. In particular, Judge Quarles wrote, *id.* at *4:

> Savelich is ordered to return to Ameritox immediately all Company documents and information, including but not limited to, Ameritox customer and sales related information in his possession. He must return to Ameritox copies of electronic media containing such documents and information; pursuant to this Order, Defendant may not destroy or otherwise alter such media.

Accordingly, *Ameritox* does not establish that it is possible to "return" an email.  At most, it establishes that it is possible to "return" a *copy* of an email.

In *Krueger,* 536 F. Supp. 3d 182, the confidentiality provision at issue included a "'Return of Materials at Termination'" clause. *Id.* at 200 (citation omitted). As to that clause, the court stated, *id.* (citation omitted).:

> It provides that, in "the event of any termination," the employee "will promptly deliver to Company all material, property, documents, data, and other information belonging to Company or the group or pertaining to Confidential Information." It also specifies that the employee "shall not take or retain any materials, property, documents, or other information, or any reproduction or excerpt thereof, belonging to the Company or the Group or containing or pertaining to any Confidential Information."

The court noted that the defendant forwarded several emails from her work email account to her personal account, and that the emails remained in defendant's personal account during the discovery phase of the litigation. *Id.* at 201. The parties did not dispute that the emails and documents constituted "Confidential Information," nor did the parties dispute that defendant "failed to 'promptly deliver'" the emails to plaintiff. *Id.* But, the defendant did not argue that delivery of the emails was impossible. Instead, defendant only argued that the agreement was ambiguous "as to when the duty to 'promptly deliver' arises.'" *Id.* at 203 (citation omitted). Therefore, the court did not have occasion to address whether it was possible for defendant to "return" an email, and only assessed the clause for ambiguity as to the requirement of delivery. Therefore, the case is of limited value here.

To be sure, if there were physical copies of the emails, then Bero would have been required to return them. But, Aston does not allege as much. To the extent that the provision calls for a former employee to return all company records "in any other form," I cannot conclude that this catch-all phrase applies to emails and email attachments, because it is not self-evident that they can be returned. Indeed, at his deposition, when Corpuz was asked whether any other employees had returned emails, he was unable to "recall any specific examples." ECF 70-7 at 32 (Tr. at 118). Juan McCausland, a member of plaintiffs' "HR" team, ECF 71-1 at 55 (Tr. at 207), was also asked at his deposition about how he would go about returning an email. He said: "I don't know." ECF 70-18 (McCausland Dep.) at 3 (Tr. at 90).

Furthermore, to read the return clause to require the physical return of emails and email attachments would render the preservation provision in the covenant superfluous. The clause clearly prohibits the deletion of records that are in digital form, such as the emails and attachments at issue here. If the emails could be returned, the preservation clause would be superfluous. Indeed,

a sensible reading of the contract, with use of the illustrative examples in the provision, is that physical records must be returned and digital records must be preserved until the employee is directed by the employer to destroy them. Moreover, nothing in the contract clearly requires Bero to provide copies of digital files to Aston.

On October 13, 2022, counsel for Bero emailed plaintiffs and SullivanStrickler and asked plaintiffs to identify any files that required deletion. ECF 70-13 at 2. On October 21, 2022, plaintiffs identified eight such files. ECF 70-14 at 2. And, SullivanStrickler confirmed that the files had been deleted as of November 2, 2022. *See* ECF 70-15 at 2; ECF 70-6 at 2.

Thus, Bero's obligation under the Return and Preservation of Records was satisfied, because he preserved the digital records at issue, and then deleted the files when asked to do so. Accordingly, to the extent that Count I depends on Aston' argument that Bero breached the Return and Preservation of Records clause, I shall deny the Motion and grant the Cross Motion.

## B. Count II (Breach of IGP Agreement)

In Count II of the Amended Complaint, plaintiffs assert that defendant "breached his obligations under the IGP by engaging in Confidentiality Violations and Competitive Activity, as defined by the IGP . . . ." ECF 50-1 at 14, ¶ 59.[20]  According to plaintiffs, Bero did not satisfy the IGP's conditions precedent.  ECF 65-1 at 35-37.

In defendant's Cross Motion, Bero asserts that the IGP is a contract between Bero and Aerotek. Therefore, he argues that Count II must fail for lack of standing, because "neither Allegis nor Aston Carter are parties to the IGP with Bero." ECF 70-1 at 37.  Defendant also argues for

---

[20] In the Motion, plaintiffs state, ECF 65 at 1: "Summary judgment is likewise proper on Count II of the Complaint, which concerns a declaration of the parties' obligations under the [IGP]." But, as noted, Count III, not Count II, concerns the plaintiffs' request for a declaratory judgment.

summary judgment as to Count II on the basis that "the IGP does not impose any affirmative obligations on Bero that can be breached." *Id.* Rather, it "imposes conditions that may or may not be fulfilled to receive additional money." *Id.*

Bero claims that plaintiffs do not address defendant's arguments in their response. ECF 84 at 9; *see* ECF 78. Accordingly, he argues that plaintiffs' "failure to respond is a concession of the issues." ECF 84 at 9.

I agree that plaintiffs' discussion of the IGP in their Motion and Opposition seems to concern their alleged entitlement to declaratory judgment under the IGP, which is the subject of Count III, rather than Bero's alleged "breach" of the IGP, which is the subject of Count II. Nonetheless, I decline to find that Aston conceded that Bero is entitled to summary judgment with respect to Count II. Instead, I shall evaluate the merits of Bero's arguments that he is entitled to summary judgment with respect to Count II.

As a preliminary matter, it is not clear that Allegis lacks standing with respect to an action concerning Bero's alleged breach of the IGP. For one, Bero's awards agreements clearly incorporated the IGP, and the IGP is clearly Allegis's Plan. *See, e.g.,* ECF 65-2 at 45, ¶ 2. Indeed, Bero's awards were conferred "pursuant to the terms of the [Plan] and by action of the Board of Directors of Allegis . . . ." ECF 65-2 at 45, 46, 47, 48. Moreover, as Allegis notes, it has extensive duties and powers under the Plan. *See*, *e.g.,* 1-2 at 16, ¶ 8.2 (". . . determining all claims for payments under this Plan by Participants. . . .").

Nevertheless, I agree with Bero that "the IGP does not impose any affirmative obligations on Bero that can be breached." ECF 70-1 at 37. Rather, it sets forth conditions precedent as to receipt of benefits under the Plan.

A condition precedent is "'a fact, other than a mere lapse of time, which, unless excused, must exist or occur before a duty of immediate performance of a promise arises.'" *Richard F. Kline, Inc. v. Shook Excavating & Hauling, Inc*., 165 Md. App. 262, 273, 885 A.2d 381, 386 (2005) (quoting *Chirichella v. Erwin*, 270 Md. 178, 182, 310 A.2d 555, 557 (1973)); *see Patriot Construction, LLC v. VK Electrical Services, LLC,* 257 Md. App. 245, 261, 290 A.3d 1108, 1117 (2023). In other words, "'where a contractual duty is subject to a condition precedent, whether express or implied, there is no duty of performance and there can be no breach by non-performance until the condition precedent is either performed or excused.'" *All State Home Mortg., Inc. v. Daniel*, 187 Md. App. 166, 182, 977 A.2d 438, 447 (2009) (quoting *Pradhan v. Maisel*, 26 Md. App. 671, 677, 338 A.2d 905, 909 (1975)).

"The determination of whether a provision in a contract constitutes a condition precedent is a question of 'construction dependent on the intent of the parties to be gathered from the words they have employed and, in case of ambiguity, after resort to the other permissible aids to interpretation.'" *Miller v. Bristol-Myers Squibb Co.,* 121 F. Supp. 2d 831, 840 (D. Md. 2000) (quoting *New York Bronze Powder Co., Inc. v. Benjamin Acquisition Corp*., 351 Md. 8, 14, 716 A.2d 230, 233 (1998)). "While no particular form of words is necessary in order to create an express condition, such words and phrases as 'if' and 'provided that,' are commonly used to indicate that performance has expressly been made conditional . . . as have the words 'when,' 'after,' 'as soon as,' or 'subject to[.]'" *Metropolitan Development Group at Cool Spring, LLC v. Cool Spring Road, LLC*, GJH-20-3237, 2022 WL 951995 at *8 (D. Md. Mar. 30, 2022) (citation omitted) (alteration in original).

The IGP states, ECF 1-2 at 14, ¶ 6.2 (emphasis added):

> ***Awards under the Plan are conditioned on*** the Participant not (i) engaging in a Competitive Activity during the Participant's term of employment or during

the eighteen (18) month period following his or her Separation from Service, or (ii) committing a Confidentiality Violation. If a Participant engages in either a Competitive Activity during the Participant's term of employment or during the eighteen (18) month period following his or her Separation from Service or commits a Confidentiality Violation, the Participant **shall be deemed not to have earned** any Investment Units; shall forfeit all of the Investment Units credited to his or her Account; and shall be required to repay to the Company any and all amounts paid to the Participant in accordance with this Article 6 before the date the Participant engaged in the Competitive Activity or committed the Confidentiality Violation.

Based on the plain language of the text in the IGP, the prohibitions on engaging in competitive activity or committing a confidentiality violation are clearly conditions precedent to receiving an award under the Plan.

*Allegis Group, Inc. v. Jordan*, 951 F.3d 203 (4th Cir. 2020), provides guidance. In that case, plaintiffs alleged that several high-level former employees of Aerotek used confidential information in violation of covenants not to solicit plaintiffs' clients, contained within an incentive benefit plan similar to the IGP. *Id.* at 206, 213. And, plaintiffs alleged that Jordan also breached the plan by soliciting employees of his former employer. *Id.* at 213-214. The defendants collectively received more than $2 million under the incentive plan at issue there. *Jordan*, 2014 WL 2612604, at *3. Therefore, Allegis sought return of its incentive payments. The district court found that the defendants had breached the terms of the incentive plan and ordered them to return the incentive payments they received. The Fourth Circuit affirmed. *Jordan*, 951 F.3d at 205-206.

Relevant here, the Fourth Circuit considered whether a competition provision contained within the incentive benefit plan constituted a restrictive covenant or, instead, a condition precedent. *See id.* at 209-210. The Court noted that the plan "explicitly uses words indicative of conditionality" by providing "that incentive payments are offered 'subject to the conditions' stated and that, 'in order to earn' incentives, the participant must comply with the conditions." *Id.* at 210. The Court described the operation of the incentive plan as follows, *id.* (emphasis in original):

Participants in the Incentive Plan were well compensated, high-level professionals who were given *the option* to join the program during their employment and, following separation, had the *further choice* of whether to receive payments *or* to compete with Allegis and its subsidiaries. By the express terms of the Plan, the Units that accrued had no value during the period of the participants' employment, and therefore they were not a supplement to the participants' salary or benefits. Rather, their value was earned after the participants' employment ended through compliance with the post-employment conditions.

The Court concluded that a plan with these features "unambiguously imposes conditions precedent for the receipt of payments." *Id.* And, under Maryland law, said the Court, "such conditions must . . . be strictly complied with – 'exactly matched' – to entitle the employees to the benefit of their bargain." *Id.* (quoting *NCO Fin. Sys., Inc. v. Montgomery Park, LLC*, 842 F.3d 816, 822 (4th Cir. 2016)); *see also Elderkin v. Carroll*, 403 Md. 343, 353-54, 941 A.2d 1127, 1133 (2008).

Like the incentive benefit plan that the Fourth Circuit considered in *Jordan*, the IGP here uses language indicative of conditionality, such as "Awards under the Plan are conditioned" and "shall be deemed not to have earned." ECF 1-2 at 14, ¶ 6.2; *see also id.* at 3, ¶ 2.7 (using the words "*in order to become entitled to earn an award*" when defining "Base Award") (emphasis added). Moreover, plaintiffs acknowledge that the "IGP *sets forth conditions precedent* that a former employee must fulfill to earn and become entitled to IGP payments . . . ." ECF 50-1 at 15, ¶ 63 (emphasis added).

In litigation before Judge Xinis involving an IGP apparently the same as the one at issue here,[21] Allegis and Aerotek state in their amended complaint that, "[u]nder the IGP Plan, eligible employees, upon termination of their employment, are free to choose between 1) complying with

---

[21] The IGP in the case before Judge Xinis, like the one in this case, is titled, "ALLEGIS GROUP INVESTMENT GROWTH PLAN FOR KEY EMPLOYEES (AMENDED AND RESTATED EFFECTIVE JANUARY 1, 2020)." *Compare* ECF 1-2 at 2 *with Allegis Group, Inc. and Aerotek, Inc. v. Nosky*, PX-22-01516, ECF 23 at 38 (D. Md. Aug. 9, 2022).

the Article 6 conditions, and thus earning the benefits that the IGP Plan offers, and (2) engaging in activities that contravene those conditions and foregoing the IGP Plan's benefits." *Allegis Group, Inc. and Aerotek, Inc. v. Nosky*, PX-22-01516, ECF 23, ¶ 58 (D. Md. Aug. 9, 2022).

Significantly, in contrast to *Jordan*, plaintiffs in this case do not allege that Bero received any monetary award under the Plan. ECF 65-1 at 10. *Jordan* establishes that a breach of contract claim against Bero could be appropriate if he had received money under the Plan. But, that is not what occurred here. To be sure, four awards of Investment Units were credited to Bero's account during his tenure at Aerotek. *See* ECF 65-2 at 45, 46, 47, 48. However, as plaintiffs acknowledge in their Motion, "[a]t no time during or after his employment with Aerotek or Aston Carter has Bero submitted a claim to the committee for IGP benefits." ECF 65-1 at 10, ¶13; *see also* ECF 70-4 at 59 (Tr. at 229). That is, although Bero received Investment Unit credits, he never redeemed them. *See* ECF 1-2 at 51, ¶ 8.1 ("A Participant or Beneficiary who believes that he or she is entitled to a benefit under the Plan . . . shall apply for such benefit by filing a claim . . . ."). Or, put in the terms of the IGP itself, these credits never "bec[a]me payable." *Id.* at 49, ¶ 6.1. Because Bero did not receive money under the Plan, he could not have breached the Plan's terms.

Given that Count II fails on the merits, my resolution of Count II does not require me to decide whether, as Bero argues, "Aerotek is the only 'Company' that is in an IGP contract with him," in light of the fact that "Bero earned Investment Units under the IGP solely as an *Aerotek* employee . . . ."[22] ECF 70-1 at 10. I note, however, that Aerotek would seem to be a necessary party to any dispute about IGP entitlements, because it was the affiliate through which the awards would have accrued, and therefore the affiliate that would be liable for any payments to Bero. *See*

---

[22] However, in my discussion of Count III, I resolve this question in favor of Bero.

Fed. R. Civ. P. 19(a)(1)(A) (requiring party joinder when, "in that person's absence, the court cannot accord complete relief among existing parties").

Because Bero has not received any payments under the Plan and has made no claim for payment, plaintiffs have no basis for relief in Count II.  It follows that, as to Count II, I shall deny the Motion and grant the Cross Motion.

### C.  Count III (Declaratory Judgment)

In Count III of the Amended Complaint, plaintiffs ask the Court to issue a declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, affirming "that they are not liable to Bero for any monetary amounts under the IGP." ECF 50-1 at 15, ¶ 65.

The Declaratory Judgment Act provides, 28 U.S.C. § 2201(a):

> In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

In order to bring a declaratory judgment action under 28 U.S.C. § 2201, the plaintiff must establish the existence of a dispute that is "'definite and concrete, touching the legal relations of parties having adverse legal interests'; and that [is] 'real and substantial[.]'" *MedImmune, Inc.*, 549 U.S. at 127 (citation omitted). This showing is required to satisfy the case or controversy requirement of Article III of the Constitution. *Id.* at 126-27.

As noted, the Declaratory Judgment Act "is remedial only and neither extends federal courts' jurisdiction nor creates any substantive rights." *CGM, LLC*, 664 F.3d at 55 (citing *Skelly Oil Co.*, 339 U.S. at 671-72); *see also Profiles, Inc.*, 453 F. Supp. 3d at 752 ("The Declaratory Judgment Act 'provides a remedy in cases otherwise in the Court's jurisdiction; it does not create an independent cause of action.'") (quoting *Elec. Motor and Contracting Co., Inc.*, 235 F. Supp. 3d at 793). Consequently, "'[a] request for declaratory relief is barred to the same extent that the

claim for substantive relief on which it is based would be barred.'" *CGM, LLC*, 664 F.3d at 55-56 (alteration in original) (citation omitted).

Further, the statute's "permissive language has long been interpreted to provide discretionary authority to district courts to hear declaratory judgment cases." *United Capitol Ins. Co.*, 155 F.3d at 493. Thus, the Declaratory Judgment Act "'merely permits' federal courts to hear those cases rather than granting litigants a right to judgment." *Medical Mutual Ins. Co. of N.C.*, 35 F.4th at 208 (quoting *Trustgard Ins. Co.*, 942 F.3d at 201-02).

Plaintiffs argue that they are entitled to summary judgment as to Count III because Bero has failed to meet the conditions precedent necessary to receive payment for credits earned under the Plan, by engaging in competitive activity and breaching his confidentiality obligations. ECF 65-1 at 34-37. They also argue that Bero is not entitled to payment because he has not made a claim for benefits, as is required under the terms of the IGP. *Id.* at 33-34.

Bero asserts that he is entitled to summary judgment on several grounds. First, he contends that a declaratory judgment is only appropriate "to settle 'actual controversies' *before* they ripen into breaches of contract or violations of law." ECF 70-1 at 38 (emphasis in original). Here, the conduct that may or may not result in Bero's entitlement to an award under the IGP has already occurred. *Id.* In other words, the relief "sought here would not provide anyone any guidance to inform *future* conduct to avoid a breach of the IGP." *Id.* at 39 (emphasis in original).

Second, defendant argues that there is no actual controversy because only Aerotek, not Allegis or Aston, would be liable to Bero under the IGP. *Id.* at 39-40. According to Bero, he participated in the IGP only as an Aerotek employee, and he expressly "agrees that if he is entitled to money under the IGP, then he can look only to Aerotek . . . for payment." ECF 70-1 at 39.

Third, Bero argues, it would "neither be useful nor afford meaningful relief to the parties to issue a declaratory judgment on whether Plaintiffs have monetary liability under the IGP," because the IGP indicates that only Aerotek, a nonparty to the litigation, can be monetarily liable to Bero under the IGP. *Id.* at 40. Thus, he urges the Court to exercise its discretion and dismiss the count. *Id.*

In response, plaintiffs maintain that, because "[t]he IGP indisputably vests Allegis's IGP Committee with plenary authority over plan administration and decision-making," it is tasked with determining Bero's eligibility for benefits under the IGP, and therefore Allegis is entitled to a declaratory judgment that Bero is not entitled to an award under the Plan. ECF 78 at 15 (citing ECF 1-2 at 10-11, 15-16, ¶¶ 3.2, 3.5, 8.1, 8.2, 8.6). As a result, Allegis requests a declaration that it is within its discretion to deny payment to Bero of any IGP funds. ECF 78 at 15. And, in light of defendant's "concession" that Aston is not liable to Bero under the terms of the Plan, plaintiffs propose to "narrow the needed declaration to Allegis's obligations only." *Id.* at 14 n. 3.

Bero replies by highlighting that, in the First Amended Complaint, plaintiffs only seek declaratory relief as to their "monetary liability" to Bero under the IGP. ECF 84 at 10; *see also* ECF 50-1 at 15, ¶ 65. According to Bero, because only Aerotek could have "monetary liability" to Bero, the "Court should reject Allegis's attempt to rewrite the declaratory judgment claim it pled and . . . should grant Bero summary judgment on Count III as to *both* Allegis and Aston Carter." ECF 84 at 11.

In my view, defendant has the better argument. The IGP provides, ECF 1-2 at 18, ¶ 10.3:

> Each Company shall be obligated to pay compensation under this Plan to its own employees who are Participants in this Plan, and neither Allegis Group nor any other Company shall be obligated to fulfill the obligations of a Company to such Company's employees under this Plan.

In Bero's Declaration, he states that he "only earned Investment Units as an Aerotek employee under Aerotek's IGP." ECF 70-5 at 3, ¶ 8.  He maintains that "only Aerotek can owe [him] money under the IGP," and Aerotek is not a party to this case.  *Id.*  And, plaintiffs do not dispute that Aerotek is the company for which Bero worked while he earned units under the IGP. Nor do plaintiffs dispute that Aerotek is the only company that is financially liable to Bero under the terms of the IGP.

Because I construe section 10.3 of the IGP to mean that only Aerotek could be monetarily liable to Bero, I find that there is no actual controversy between plaintiffs and Bero that would be appropriate for resolution by declaratory judgment. *See Synopsys, Inc v. Risk Based Security, Inc.*, 70 F.4th 759, 764 (4th Cir. 2023) ("Article III's case and controversy requirement—and the attendant doctrine of mootness—is 'no less strict under the Declaratory Judgment Act than in case of other suits.'") (quoting *Altvater v. Freeman*, 319 U.S. 359, 363 (1943)); *see also Holloway v. City of Virginia Beach,* 42 F.4th 266, 273 (4th Cir. 2022) ("A dispute is moot, depriving federal courts of jurisdiction to decide it, when 'the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.'") (quoting *Catawba Riverkeeper Found. v. N.C. Dep't of Transp.*, 843 F.3d 583, 588 (4th Cir. 2016)).

As to plaintiffs' attempt to recast Count III as a request for a declaratory judgment that Bero is not entitled to an award under the IGP, I note that "[a] party cannot raise a new claim through argument on summary judgment." *Bassi & Bellotti S.p.A. v. Transcontinental Granite, Inc.*, DKC-08-1309, 2011 WL 856366, at *10 (D. Md. Mar. 9, 2011) (citing *Sensormatic Sec. Corp. v. Sensormatic Electronics Corp.*, 455 F. Supp. 2d 399, 435 (D.Md. 2006)); *see also Potts v. DiPaola,* RDB-21-1073, 2022 WL 616814, at *3 (D. Md. Mar. 2, 2022) ("The Court may not address new claims raised in opposition to a dispositive motion, because it is not a vehicle for

amending the complaint.") (citing *Whitten v. Apria Healthcare Group, Inc.*, PWG-14-3193, 2015 WL 2227928, at \*7 (D. Md. May 11, 2015)). Indeed, the Fourth Circuit has made clear that the only way to raise new claims after discovery has begun is through amendment of the complaint. *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 617 (4th Cir.2009) (citing *Barclay White Skanska, Inc. v. Battelle Mem'l Inst.*, 262 F. App'x 556, 563 (4th Cir.2008) (unpublished)), *cert. denied*, 558 U.S. 1158 (2010).

Aerotek is not a party to this litigation. And, Bero does not argue that he is owed money under the IGP. *Cf. Jordan,* 2013 WL 1701125 (addressing merits of whether plaintiffs owed monetary awards under Allegis's incentive plan when raised by defendants in counterclaim). As noted, Bero withdrew his counterclaim, in which he asserted that he is owed payment under the IGP. *See* ECF 60. And, the parties agree that he has not submitted a claim for benefits under the IGP. *See* ECF 65-1 at 10; ECF 70-2 at 5.

In light of the foregoing, I decline to issue a declaratory judgment as to whether plaintiffs are monetarily liable to Bero under the IGP or whether Bero has satisfied the conditions precedent under the IGP. Instead, I shall deny and dismiss Count III, without prejudice.

## IV.    Conclusion

For the reasons stated above, I shall grant the Motion to Amend; deny the Motion to Strike; and deny the Motion as to Counts I and II.  Moreover, I shall grant the Cross Motion as to Counts I and II.  And, I shall deny and dismiss Count III.

An Order follows, consistent with this Memorandum Opinion.


Date:   September 1, 2023                           _____/s/_____

                                                    Ellen L. Hollander
                                                    United States District Judge